**FIRST NATIONAL BANK IN HARVEY, Plaintiff,**

v.

**COLONIAL BANK and the Federal Reserve Bank of Chicago, Defendants.**

No. 92 C 1679.

United States District Court, N.D. Illinois, Eastern Division.

July 7, 1995.

Richard W. Burke, Andrew D. James, Burke, Warren & MacKay, Chicago, IL, Bret Andrew Rappaport, Martin W. Salzman, and Eric S. Rein, Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, for plaintiff.

Mitchell S. Goldgehn, Nathan H. Lichtenstein, Andrew Scott Williams, Aronberg, Goldgehn, Davis & Garmisa, Chicago, IL, and Elizabeth Ann Knospe and Anna M. Voytovich, Federal Reserve Bank of Chicago, Chicago, IL, for defendants.

### MEMORANDUM OPINION

GRADY, District Judge.

Before the court are the parties' cross-motions for summary judgment. For the reasons explained, plaintiff First National Bank in Harvey's motion is granted in part and denied in part. Defendant Colonial Bank's motion is granted in part and denied in part. Defendant Federal Reserve Bank of Chicago's motion is granted.

### BACKGROUND

■ Check kiting is a form of bank fraud.[1] The kiter opens accounts at two (or more) banks, writes checks on insufficient funds on one account, then covers the overdraft by depositing a check drawn on insufficient funds from the other account.

To illustrate the operation, suppose that the defrauder opens two accounts with a deposit of $500 each at the First National Bank and a distant Second National Bank. (A really successful defrauder will have numerous accounts in fictitious names at banks in widely separated states.) The defrauder then issues for goods or cash checks totalling $3000 against the First National Bank. But before they clear and overdraw the account, he covers the overdrafts with a check for $4,000 drawn on the Second National Bank. The Second National account will be overdrawn when the $4,000 check is presented; before that happens, however, the defrauder covers it with a check on the First National Bank. The process is repeated innumerable times until there is a constant float of worthless checks between the accounts and the defrauder has bilked the banks of a substantial sum of money.

John D. O'Malley, "Common Check Frauds and the Uniform Commercial Code," 23 Rutgers L.Rev. 189, 194 n. 35 (1968–69). By timing the scheme correctly and repeating it over a period of time, the kiter can use the funds essentially as an interest-free loan. *Williams v. United States*, 458 U.S. 279, 281 n. 1, 102 S.Ct. 3088, 3090 n. 1, 73 L.Ed.2d 767 (1982) (quoting Brief for the United States).

Check kiting is possible because of a combination of two rules found in Article 4 of the Uniform Commercial Code. Under § 4–208(a)(1),[2] a depositary bank may allow a customer to draw on uncollected funds, that is, checks that have been deposited but not yet paid.[3] Second, under §§ 4–301 and 4–

---

[1] 18 U.S.C. § 1344; *United States v. LeDonne*, 21 F.3d 1418, 1426 (7th Cir.), *cert. denied*, — U.S. ——, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994).

[2] 810 ILCS § 5/4–208(a)(1). Illinois law governs this case. Illinois' version of the Uniform Commercial Code appears at chapter 810, act 5 of the Illinois Compiled Statutes. Citations to the UCC sections in this opinion will simply take the form used in the text.

[3] Regulation CC, issued by the Board of Governors of the Federal Reserve System, governs the availability of funds and the collection of checks.

12 C.F.R. pt. 229. Under Regulation CC, a depositary bank must make funds drawn on a local check available two days following the deposit. 12 C.F.R. § 229.12(b)(1). During this two-day period, the funds are "uncollected." The depositary bank may either return checks drawn on those funds or choose to pay the checks. After two days, the depositary bank's records show the check "collected" for Regulation CC purposes, although the check is not actually collected until it is paid by the payor bank. Pl. 12(M) ¶ 3.

302, a payor bank must either pay or dishonor a check drawn on it by midnight of the second banking day following presentment. Barkley Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 5.03[5] (3d ed. 1990). Thus when a kite is operating, the depositary bank allows the kiter to draw on uncollected funds based on a deposit of a check. The depositary bank presents that check to the payor bank, which must decide whether to pay or return the check before the midnight deadline. The check may appear to be covered by uncollected funds at the payor bank, and so the payor bank may decide to pay the check by allowing the midnight deadline to pass.

A kite crashes when one of the banks dishonors checks drawn on it and returns them to the other banks involved in the kite. Clark, *supra*. Usually, such a dishonor occurs when one bank suspects a kite. *Id.* However, an individual bank may have trouble detecting a check kiting scheme. "Until one has devoted a substantial amount of time examining not only one's own account, but accounts at other banks, it may be impossible to know whether the customer is engaged in a legitimate movement of funds or illegitimate kiting." James J. White & Robert S. Summers, *Uniform Commercial Code* § 17–1 (3d ed. 1988 & Supp.1994). But each bank is usually able to monitor only its own account, and "[t]here is no certain test that distinguishes one who writes many checks on low balances from a check kiter." White & Summers, *supra*, § 17–2. Even if a bank suspects a kite, it might decide not to take any action for a number of reasons. First, it may be liable to its customer for wrongfully dishonoring checks. § 4–202. Second, if it reports that a kite is operating and turns out to be wrong, it could find itself defending a defamation suit. White & Summers, *supra*, § 17–1 (Supp.1994). Finally, if it errs in returning checks or reporting a kite, it may risk angering a large customer. *Id.*

### FACTS

This case involves the fallout of a collapsed check kite. Two of the banks involved, First National Bank in Harvey ("First National") and Colonial Bank ("Colonial") are the parties to this litigation. The Federal Reserve Bank of Chicago (the "Reserve Bank"), through whose clearinghouse the relevant checks were processed, is also a party.

Shelly International Marketing ("Shelly") opened a checking account at First National in December 1989. Def. 12(M) ¶ 5.[4] The principals of Shelly also opened accounts at the Family Bank (a nonparty) in the names of Shelly Brokerage and Crete Trading around December 1990. Def. 12(M) ¶ 11. On December 31, 1991, the principals of Shelly opened a checking account at Colonial Bank in the name of World Commodities, Inc. Def. 12(M) ¶ 6. Shelly and World Commodities were related companies, with the same or similar shareholders, officers, and directors. Def. 12(M) ¶ 7. The principals of Shelly and World Commodities began operating a check kiting scheme among the accounts at the three banks in early 1991. Def. 12(M) ¶ 12.

The main events at issue in this case took place in February 1992. The checks that form the basis of this suit are thirteen checks totalling $1,523,892.49 for which First National was the depositary bank and Colonial was the payor bank (the "Colonial checks"). Also relevant are seventeen checks totalling $1,518,642.86 for which Colonial was the depositary bank and First National was the payor bank (the "First National checks").

On Monday, February 10, Shelly deposited the thirteen Colonial checks to its First National account. Def. 12(M) ¶ 14. First National then sent those checks through the check clearing system. Def. 12(M) ¶ 15. That same day, World Commodities deposited the seventeen First National checks to its Colonial account. Pl. 12(M) ¶ 16.

The next day, Tuesday, February 11, the Colonial checks were presented to Colonial for payment, and the First National checks were presented to First National for payment. Pl. 12(M) ¶ 16; Def. 12(M) ¶ 15. That day, David Spiewak, an officer with First

---

4. Citations to the statements of material facts as to which there is no genuine issue under Local General Rule 12(M) of the Northern District of Illinois and to the responses under Rule 12(N) will take the abbreviated form, e.g., "Def. 12(M) ¶ 1."

National's holding company, Pinnacle, reviewed the bank's records to determine why there were large balance fluctuations in Shelly's First National account. Pl. 12(M) ¶ 19. Spiewak began to suspect that a kite might be operating. Pl. 12(M) ¶ 19. He did not know whether Colonial had enough funds to cover the Colonial checks that had been deposited on Monday, February 10, and forwarded to Colonial for payment. Pl. 12(M) ¶ 19. Later that day, First National froze the Shelly account to prevent any further activity in it. Pl. 12(M) ¶ 19.

On the morning of Wednesday, February 12, Spiewak met with First National president Dennis Irvin and Pinnacle's chief lending officer Mike Braun to discuss the Shelly account. Pl. 12(M) ¶ 22. Spiewak informed the others of what he knew, and the three agreed that there was a possible kite. Pl. 12(M) ¶ 22. They concluded that further investigation was needed. Pl. 12(M) ¶ 22. The First National officers decided to return the First National checks to Colonial. First National says that the decision was made at this meeting, but Colonial says the decision was actually made the day before. Pl. 12(M) ¶ 22; Def. 12(N) ¶ 22.

On Wednesday, First National returned the First National checks to Colonial. Under Regulation CC, a bank that is returning checks in excess of $2,500.00 must provide notice to the depositary bank either by telephone, actual return of the check, or Fed Wire before 4:00 p.m. on the second business day following presentment. Pl. 12(M) ¶ 23. First National notified Colonial by Fed Wire that it was returning the seventeen First National checks. Pl. 12(M) ¶¶ 24, 31. Initially, the large item return form indicated that the reason for the return was "uncollected funds," but Spiewak changed that reason to "refer to maker." Pl. 12(M) ¶ 27.

Colonial received the Fed Wire notices at approximately 2:45 p.m. on Wednesday and routed them to its cashier, Joanne Topham. Pl. 12(M) ¶ 32. Randall Soderman, a Colonial loan officer, was informed of the large return, and immediately began an investigation. Pl. 12(M) ¶ 32. He realized that if the Colonial checks were not returned by midnight that same day, Colonial would be out the money. Pl. 12(M) ¶ 33. Returning the Colonial checks before midnight would protect Colonial from liability, but it would risk disappointing the customer. Pl. 12(M) ¶ 34. Anthony Schiller, the loan officer in charge of the World Commodities account, called World Commodities comptroller Charles Patterson and its attorney Jay Goldstein. Def. Add'l Facts ¶¶ 11, 12. Both assured Schiller that the First National checks were good and should be redeposited. Def. Add'l Facts ¶¶ 11, 12. Ultimately, Richard Vucich, Colonial's president, and Joanne Topham, Colonial's cashier, decided not to return the Colonial checks on Wednesday. They decided instead to meet on Thursday morning with Schiller to discuss the matter. Pl. 12(M) ¶ 47.

Schiller, Topham, and Vucich met on the morning of Thursday, February 13. Pl. 12(M) ¶ 48. At the conclusion of the meeting, they decided to return the thirteen Colonial checks to First National. Pl. 12(M) ¶ 48. At about 10:45 a.m., Colonial telephoned First National to say that it intended to return the Colonial checks. Pl. 12(M) ¶ 50. Colonial sent the Colonial checks back through the Reserve Bank as a return in a return cash letter. Pl. 12(M) ¶ 51. The Reserve Bank debited First National's Reserve Bank account in the amount of the Colonial checks. Pl. 12(M) ¶ 51. First National received the returned Colonial checks on Friday, February 14. Pl. 12(M) ¶ 52.

First National then resorted to the Fed's "challenge procedure" to contest the return of the Colonial checks after the midnight deadline. First National prepared and submitted to the Reserve Bank a "Sender's Claim of Late Return" form for each of the Colonial checks. Pl. 12(M) ¶ 55. The Reserve Bank processed the claim forms and credited the Reserve Bank account of First National $1,523,892.49 and debited the Reserve Bank account of Colonial in the same amount. Pl. 12(M) ¶ 56. On February 24, Colonial prepared and filed a "Paying Bank's Response to Claim of Late Return" form for each of the thirteen Colonial checks. Pl. 12(M) ¶ 57. As a consequence of the processing of the response forms, the Reserve Bank reversed the credit given to First Na-

tional and the debit made to Colonial. Pl. 12(M) ¶ 67; Def. 12(N) ¶ 67.[5]

■ First National then filed this suit against Colonial and the Reserve Bank, alleging that Colonial wrongfully returned the Colonial checks after the midnight deadline and the Reserve Bank wrongfully accepted the late return.[6] Count I of First National's amended complaint against Colonial alleges breach of warranty under Regulation CC for the late return of the checks. 12 C.F.R. § 229.34. Count II against the Reserve Bank alleges breach of warranty under Regulations CC and J for accepting the late return. 12 C.F.R. § 210.6. Count III against Colonial alleges breach of a duty of ordinary care in Colonial's return of the Colonial checks. Count IV against the Reserve Bank alleges breach of a duty of ordinary care in processing the late return. Count V against Colonial alleges breach of UCC § 4–302 for Colonial's failure to return the checks by the midnight deadline. Count VI against the Reserve Bank and Count VII against Colonial allege breach of contract for each party's failure to comply with the terms of the Reserve Bank's Operating Circular No. 4 ("OC–4").

First National moved for partial summary judgment as to Count V. On August 27, 1993, this court denied the plaintiff's motion. *First Nat'l Bank in Harvey v. Colonial Bank*, 831 F.Supp. 637 (N.D.Ill.1993). The parties now have each moved for summary judgment on all counts. Along with deciding

the remaining counts, today's opinion reconsiders portions of our earlier ruling on Count V. *Avitia v. Metropolitan Club*, 49 F.3d 1219, 1227 (7th Cir.1995).

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A "genuine issue of material fact exists only where 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Wallace v. Tilley*, 41 F.3d 296, 299 (7th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). In considering such a motion, the court must view all inferences in the light most favorable to the nonmoving party. *Tolentino v. Friedman*, 46 F.3d 645, 649 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995) (No. 94–1812–CFX). The court will enter summary judgment against a party who does not come forward with evidence that would reasonably permit a finder of fact to find in his or her favor on a material question. *McGrath v. Gillis*, 44 F.3d 567, 569 (7th Cir.1995).

---

**5.** Although the parties dispute the proper terms to describe these entries in the Reserve Bank accounts, the result is the same using either party's terms.

**6.** The court has subject matter jurisdiction over the claims against the Reserve Bank under 12 U.S.C. § 632, which deems a suit against any Federal Reserve bank to "arise under" the laws of the United States and therefore to fall within the district court's original jurisdiction. The court has jurisdiction over the claims against Colonial Bank under 28 U.S.C. § 1367(a), which gives district courts supplemental jurisdiction over claims (including those against additional parties) that form part of the same case as those claims that raise the federal question. In this case, the claims against Colonial Bank arise out of the same transactions and occurrences as those against the Reserve Bank.

We believe that federal jurisdiction exists even in light of *First Illinois Bank & Trust v. Midwest Bank & Trust Co.*, 30 F.3d 64 (7th Cir.1994), *cert. granted sub nom. Bank One Chicago v. Midwest Bank & Trust Co.*, —— U.S. ——, 115 S.Ct. 2607, 132 L.Ed.2d 852 (1995). In that case, the Seventh Circuit held that disputes between two depositary banks over Regulation CC were to be handled administratively before the Board of Governors of the Federal Reserve System. *Id.* at 65. *First Illinois* differs from this case, however, because jurisdiction in that case was premised on the Expedited Funds Availability Act. 12 U.S.C. § 4010. The Act conferred federal jurisdiction only over suits between a depositary institution and a person other than a depositary institution. There, the dispute was between two depositary banks. Here, in contrast, jurisdiction exists because the Reserve Bank is a party and the claims against Colonial form part of the same case as those claims against the Reserve Bank.

## I. Count V: Breach of UCC § 4–302 Against Colonial

### A. Accountability

■ Article 4 of the Uniform Commercial Code adopts a policy of "final payment"; that is, a check is considered to be finally paid at some specific and identifiable point in time. § 4–215 Comment 1. Final payment is the "end of the line" in the check collection process. *Id.* Section 4–301 sets up the "midnight deadline" in the process: a payor bank which intends to return a check presented to it must do so before midnight of the next banking day following receipt of the check. §§ 4–301(a), 4–104(a)(10). If a payor bank fails to return a check before the midnight deadline, final payment occurs. *Los Angeles Nat'l Bank v. Bank of Canton*, 229 Cal. App.3d 1267, 280 Cal.Rptr. 831, 836 (1991); *see Rock Island Auction Sales, Inc. v. Empire Packing Co.*, 32 Ill.2d 269, 204 N.E.2d 721, 722–23 (1965); *Templeton v. First Nat'l Bank*, 47 Ill.App.3d 443, 5 Ill.Dec. 720, 724, 362 N.E.2d 33, 37 (1977).

■ Section 4–302 spells out the payor bank's liability for its late return of an item, that is, return after the midnight deadline:

> (a) If an item is presented to and received by a payor bank, the bank is *accountable* for the amount of:
>
> > (1) a demand item, other than a documentary draft, whether properly payable or not, if the bank ... does not pay or return the item or send notice of dishonor until after its midnight deadline....

§ 4–302 (emphasis added). The operative word in this section is "accountable." Courts interpreting this section have nearly unanimously concluded that § 4–302 imposes strict liability on a payor bank for failing to adhere to the midnight deadline, and makes the measure of damages the face amount of the check. In an early decision, the Illinois Supreme Court held that "accountable" means "liable" for the amount of the item. *Rock Island Auction Sales, Inc. v. Empire Packing Co.*, 204 N.E.2d 721, 723 (Ill.1965). The

*Rock Island* court contrasted the "accountability" language in § 4–302 with the language used to specify the measure of damages in what is now § 4–103(e).[7] Section 4–103(e) makes a bank liable for failing to exercise ordinary care in the handling of a check in "the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care." § 4–103(e). The Official Comment to this section explains: "When it is established that some part or all of the item could not have been collected even by the use of ordinary care the recovery is reduced by the amount that would have been in any event uncollectible." In other words, § 4–103(e) imposes liability in the amount of the loss caused by the negligence, while § 4–302(a) imposes strict liability in the face amount of the check.

The *Rock Island* court reasoned that the special role of the payor bank in the check collection system justifies the imposition of liability regardless of negligence. The midnight deadline requires the payor bank—the bank in the best position to know whether there are funds available to cover the check—to decide whether to pay or return the check:

> The role of a payor bank in the collection process ... is crucial. It knows whether or not the drawer has funds available to pay the item. The legislature could have considered that the failure of such a bank to meet its deadline is likely to be due to factors other than negligence, and that the relationship between a payor bank and its customer may so influence its conduct as to cause a conscious disregard of its statutory duty.

*Rock Island*, 204 N.E.2d at 723.

The overwhelming majority of courts that have considered the meaning of § 4–302(a) have followed the *Rock Island* court in concluding that the liability of a payor bank that fails to return a check by the midnight deadline is strict and is in the face amount of the check. *See, e.g., Starcraft Co. v. C.J. Heck*

---

7. Section 4–103(e) provides:
   The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care. If there is also bad faith it includes any other damages the party suffered as a proximate consequence.

Co., 748 F.2d 982, 986 (5th Cir.1984); *Chrysler Credit Corp. v. First Nat'l Bank & Trust Co.,* 746 F.2d 200, 201 (3d Cir.1984); *American Title Ins. Co. v. Burke & Herbert Bank & Trust Co.,* 813 F.Supp. 423, 426 (E.D.Va. 1993), *aff'd,* 25 F.3d 1038 (4th Cir.1994); *Bank Leumi Trust Co. v. Bank of Mid–Jersey,* 499 F.Supp. 1022, 1024 (D.N.J.1980), *aff'd,* 659 F.2d 1065 (3d Cir.1981); *Los Angeles Nat'l Bank v. Bank of Canton,* 229 Cal. App.3d 1267, 280 Cal.Rptr. 831, 838 (Ct.App. 1991); *Citizens Fidelity Bank & Trust Co. v. Southwest Bank & Trust Co.,* 472 N.W.2d 198, 202–03 (Neb.1991); *State & Sav. Bank v. Meeker,* 469 N.E.2d 55, 58–59 (Ind.Ct.App. 1984).[8]

Even where the damage suffered by the payee is not caused by the lateness of the return, the midnight deadline still has been strictly enforced. For example, in *Chicago Title Ins. Co. v. California Canadian Bank,* 1 Cal.App.4th 798, 2 Cal.Rptr.2d 422, 424 (Ct.App.1991), the payor bank decided to return twenty-eight checks involved in a massive check fraud scheme. The checks left the bank before the midnight deadline, but did not arrive at the clearinghouse until the next day—after the midnight deadline had passed.

*Id.* at 424. The court held that the bank's return was late. *Id.* at 425. It held the bank strictly accountable for the face amount of the checks, reasoning that the bank " 'may be held strictly liable for its failure to return the checks by the applicable deadlines, regardless whether [the other party] demonstrated it suffered actual damage solely as a result of [the Bank's] omission.' " *Id.* at 426–29 (quoting *Los Angeles Nat'l Bank v. Bank of Canton,* 229 Cal.App.3d 1267, 280 Cal. Rptr. 831, 838 (Ct.App.1991)); *see also American Title Ins. Co. v. Burke & Herbert Bank & Trust Co.,* 813 F.Supp. 423, 426 (E.D.Va.1993) ("[L]iability for the face amount of the check is imposed without regard to whether any damages have been sustained as a result of the payor bank's failure to make a timely return."), *aff'd,* 25 F.3d 1038 (4th Cir.1994).

Reading "accountable" to mean strictly liable for the face amount of the check finds further support in the Seventh Circuit's analysis in *Appliance Buyers Credit Corp. v. Prospect Nat'l Bank,* 708 F.2d 290, 293 (7th Cir.1983). In that case, the plaintiff depositor argued that § 4–212[9] imposed strict liability in the face amount of the check on a

---

8. Commentators, too, have concluded that § 4–302 liability is strict. *See, e.g.,* Henry J. Bailey & Richard B. Hagedorn, *Brady on Bank Checks* ¶ 24.12 (7th ed. 1992) ("When a payor bank retains a check drawn on it for a period beyond its midnight deadline, the 1962 and 1990 UCCs both make the bank accountable for the amount of the item. This rule was first given effect in an Illinois decision [*Rock Island*] holding a bank liable for the amount of a check retained beyond the permitted time limits.") ¶ 24.9 ("If the bank does not act within that specified time limit, the bank is absolutely liable for the amount of the item."); Barkley Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 5.02[1][b] (3d ed. 1990) ("The *Rock Island* case seems completely correct. The drafters consciously drew a sharp contrast between the 'strict' accountability of the drawee bank for holding an item beyond the midnight deadline, and the liability of collecting banks, which turns on the existence of actual damages under § 4–103(5). If the drafters had intended to require a showing of actual loss before the drawee bank could be held liable, they could easily have said so."); 6 William D. Hawkland et al., *Uniform Commercial Code Series* § 4–302:04 (1984) ("The difference in liability under UCC subsection 4–103(5) for failure to use ordinary care and the 'accountability' under UCC subsection 4–302(a) are startling. The latter has

been equated with liability for the face amount of the item without regard to whether the depositary holder has in fact suffered any loss."); James J. White & Robert S. Summers, *Uniform Commercial Code* § 17–4 (3d ed. 1988) ("[O]ne who makes final payment is accountable for the amount of the item irrespective of the loss that others may have suffered.").

9. At the time, § 4–212 provided:

(1) If a collecting bank has made provisional settlement with its customer for an item and itself fails by reason of dishonor, suspension of payments by a bank or otherwise to receive a settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account or obtain refund from its customer whether or not it is able to return the items if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts. These rights to revoke, charge back and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final (subsection (3) of section 4–211 and subsections (2) and (3) of section 4–213).

Ill.Rev.Stat. ch. 26, para. 4–212 (quoted in *Appliance Buyers,* 708 F.2d at 292).

bank which fails to give the depositor timely notice of a check's dishonor and charges back the depositor's account. The court held that it did not because § 4–212 does not make the bank accountable. The court compared § 4–212 with other Article 4 provisions that use the term "accountable," including § 4–302(a):

[C]ertain sections of the Uniform Commercial Code such as 4–302(a) ... do impose liability on a bank for the face value of items in given situations, but we have found no similar obligation under section 4–212. The specific language of sections 4–302(a) ... holds the bank "accountable for the amount of" the item in question. Cases construing these sections hold that the term "accountable" is "the operative term ... which imposes liability for the face amount of a check...." *Colorado National Bank v. First National Bank & Trust Co.,* 459 F.Supp. 1366, 1372 (W.D.Mich.1978). Section 4–212 does not contain the "operative term" holding a bank "accountable" for the face value of a check if the bank improperly charges back the amount of a provisional credit against the depositor's account. It is obvious that if the drafters of the Uniform Commercial Code had intended to make a bank liable for the face value of a check under section 4–212, they would have held the bank "accountable" in specific language for the face amount of the check as they have under other Code sections. Because section 4–212 does not contain any language holding a bank "accountable" for the face value of a dishonored check, nor has our independent research uncovered any case law holding a bank "accountable" under section 4–212, we hold that the drafters of section 4–212 did not intend to impose absolute liability on a bank if the bank charged back a dishonored check against the depositor's account after failing to give the depositor timely notice of the check's dishonor.

*Id.* at 293. Under this reasoning, § 4–302 imposes absolute liability in the face amount of the check for a payor bank's failure to meet the midnight deadline.

But is it appropriate to enforce the accountability provision of § 4–302 where a check kiting scheme is involved? The Minnesota Supreme Court did in *Town & Country State Bank v. First State Bank,* 358 N.W.2d 387, 393–95 (Minn.1984). There, the court held that two payor banks that held kited checks beyond the midnight deadline made "final payment" on the checks and were therefore accountable for the amounts of those checks. *Accord Schwegmann Bank & Trust Co. v. Bank of La.,* 595 So.2d 1185 (La.Ct.App.), *writ denied,* 598 So.2d 360 (La. 1992); *Farmers & Merchants Bank v. Bank of America,* 20 Cal.App.3d 939, 98 Cal.Rptr. 381 (Ct.App.1971).

Colonial cites cases in which courts have declined to impose strict liability under other UCC provisions. However, none of these other provisions contains the "accountable" language found in § 4–302. *County of Pierce v. Suburban Bank,* 815 F.Supp. 1124, 1126 (N.D.Ill.1993) (§ 4–207); *Sanwa Business Credit Corp. v. Continental Ill. Nat'l Bank & Trust Co.,* 247 Ill.App.3d 155, 187 Ill.Dec. 45, 50, 617 N.E.2d 253, 258 (Ill.App. Ct. 1st Dist.1993) (§ 4–401). The reasoning of these cases, then, is simply not applicable here.

■ This court's prior opinion held that First National could not recover under the accountability provision of § 4–302 if it would be unjustly enriched by the recovery. § 1–103; 831 F.Supp. at 641. On the undisputed evidence presented by First National on the present motion, however, we now see that it did suffer a loss. At some point during the check kiting scheme, funds were siphoned out of the banking system, causing a deficit in First National's assets. Pl. 12(M) ¶¶ 72, 74.[10] The important point is that First National will not be unjustly enriched by recovering from Colonial. It has suffered a loss at some point, and will not experience a windfall if it recovers from Colonial.

Therefore, we conclude that Colonial is absolutely liable in the face amount of the Colonial checks for missing the midnight deadline. This does not end the analysis, however, because Colonial raises the defenses of good faith and mistaken payment to defeat strict accountability.

---

**10.** Defendants' evidence does not refute this.

See discussion *infra* section C.

## B. Good Faith

The general provisions of the Uniform Commercial Code state: "Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." § 1–203. The Code defines "good faith" as "honesty in fact in the conduct or transaction concerned." § 1–201(19). Colonial argues that First National's lack of good faith defeats its § 4–302 claim of accountability, contending that First National orchestrated the events of the week of February 10 in order to cause Colonial to miss the midnight deadline for returning the Colonial checks.

The first question is whether we should even consider bad faith in this check kiting case. First National urges us to refrain from injecting notions of bad faith to reallocate the loss here. It contends that introducing the concept of bad faith will muddy the concepts of certainty and finality, which are central to the treatment of kites by Article 4. However, the UCC itself, in § 1–103, injects notions of good faith into every transaction covered by it, and we cannot simply ignore the statute.

Colonial charges that First National returned the seventeen First National checks to Colonial on Wednesday, February 12, under circumstances amounting to bad faith. Colonial argues that First National deliberately caused confusion in returning the First National checks, which caused Colonial to miss the midnight deadline for the Colonial checks.

■ Colonial offers the following facts to show First National's bad faith. On Tuesday, February 11, Spiewak thought that a kite was taking place and together with other First National officers decided that the First National checks would be dishonored and returned to Colonial. Def. Add'l Facts ¶ 4. First National returned the checks the next day, Wednesday, a day on which it is closed for business. It also notified Colonial of the return late in the day (2:45 p.m.) by Fed Wire rather than by telephone, a practice that is rarely used and less desirable than telephone notice because a wire notice may not be picked up by an employee for some time, while telephonic notice is received di-rectly by a bank employee who can take immediate action. Def. Add'l Facts ¶¶ 13, 18. Finally, First National changed the reason for the return from "uncollected funds" to "refer to maker." When Colonial received the wire transmittal, it attempted to contact First National to determine why First National returned the checks "refer to maker." Def. Add'l Facts ¶ 5. No one at Colonial was able to talk to anyone at First National, however, because a recorded message informed Colonial employees that First National was closed on Wednesdays. Def. Add'l Facts ¶ 9. First National's endorsement stamp contains only its general telephone number, not any other telephone number that would allow telephone calls to be made even when the switchboard is closed, as is the practice at most Chicago area banks. Def. Add'l Facts ¶ 10.

In short, Colonial argues that First National's failure to advise Colonial of the kite, its delay in giving notice of the return, its use of Fed Wire to give notice of the return, its return of the checks marked "refer to maker," and its return of the checks on a day when it was closed for business caused Colonial to miss the midnight deadline for the Colonial checks. These facts amount to bad faith, Colonial contends; consequently First National may not recover any losses it suffered in the kite. And, in any event, whether First National's acts constitute bad faith is an issue of fact that precludes summary judgment in favor of First National.

Colonial's argument raises specific questions about whether First National's conduct amounts to bad faith. But it also raises more general questions about banks' conduct in check kiting schemes: Does a depositary bank that suspects a kite have a good faith duty to disclose its suspicions to the payor bank? Furthermore, does a bank act in bad faith if it discovers or suspects a kite and attempts to shift the loss to the other bank by returning checks drawn on it while at the same time forwarding checks that have been deposited with it for payment?

Courts that have dealt with these issues usually take the latter two questions togeth-

er,[11] and most have concluded that a bank has no good faith obligation to disclose a suspected kite or to refrain from attempting to shift the kite loss. These were the conclusions of the Mississippi Supreme Court in the leading case of *Citizens Nat'l Bank v. First Nat'l Bank*, 347 So.2d 964 (Miss.1977). In *Citizens*, a check kite was operating through accounts at Citizens National Bank and at First National Bank. First National discovered the kite, and returned all checks drawn on its account that Citizens had presented. At the same time, First National presented checks to Citizens that the kiter had drawn on Citizens and deposited with First National. First National also accepted deposits by the kiter and payments by Citizens. After the kite crashed, Citizens sued First National, charging that First National converted funds belonging to Citizens. *Id.* at 966.

The Mississippi Supreme Court upheld the dismissal of the complaint, agreeing with the chancellor's opinion which stated, "I cannot find where FNB has been charged with doing anything other than acting as a prudent and careful bank should act." *Id.* at 967, 969. In holding that there was no duty on the part of First National to notify Citizens of its conviction that their mutual customer was kiting checks, the court reasoned:

[T]hese two banks were competitors in the banking field and ordinarily banks deal with each other at arm's length. The bill does not allege any circumstances or facts that tend to show that a confidential or fiduciary relationship existed between these two banks, neither does it show that there is any requirement in the banking field that one bank notify another of its discovery of a customer kiting checks. In the absence of a fiduciary or confidential relationship, or some other legal duty, First National Bank had no duty to inform Citizens National Bank that Duran was kiting checks. This being true, we are of the opinion that First National Bank had the legal right to continue to accept for deposit checks drawn by Duran on accounts at Citizens National Bank and present those checks for payment. At the same time, First National Bank had the legal right to refuse to pay checks drawn by Duran on accounts in First National Bank and deposited in Citizens National Bank.

*Id.* at 967.

In a more recent case, the district court in Connecticut similarly concluded that a bank's failure to tell another bank about a suspected kite, while returning checks drawn on it and

11. In *NationsBank of Maryland v. Harris Bank*, No. 93 C 615, 1993 WL 179522 (N.D.Ill. May 25, 1993), the court distinguished between these two inquiries. In that case, the depositary bank which suffered the loss in a check kiting scheme sued the payor bank. The payor bank had returned checks after the midnight deadline and had failed to provide notice of the return within the time requirements established by Regulation CC. The depositary bank sued for consequential damages resulting from the payor bank's alleged bad faith handling of the return. § 4–103(e) ("The measure of damages for failure to exercise ordinary care in handling of an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care. If there is also bad faith it includes any other damages the party suffered as a proximate consequence."); 12 C.F.R. § 229.38(a) ("A bank that fails to act in good faith under this subpart may be liable for other damages, if any, suffered by the party as a proximate consequence.").
    The depositary bank argued that had the payor bank timely returned the checks or notified it of the return, it would have been able to revoke certain provisional payments of checks drawn on it that had been made after the midnight dead-

line for the other checks passed. The payor bank's failure to comply with the time requirements for returning or notifying amounted to bad faith, according to the depositary bank.

The payor bank argued that it did not act in bad faith because it had no duty to disclose its knowledge of the check kite to the depositary bank. The court rejected that argument: "Notwithstanding the existence of a check kiting scheme, [the payor bank] is obligated to comply in good faith with all statutory and regulatory requirements for the return of items. The relevant question is motivation, and NationsBank's allegations of a deliberate attempt to shift the risk of loss stemming from a check kiting scheme is sufficient to survive the instant motion for partial judgment on the pleadings." *Id.* at *5.

*NationsBank* differs from this case. The issue there was whether the payor bank complied with its good faith duty to observe the statutory and regulatory requirements governing the timely return of checks. In this case, in contrast, the question is whether the depositary bank's lawful presentation of checks for payment and lawful return of checks drawn on it can defeat the strict accountability rule on a theory of bad faith.

accepting checks drawn on the other bank, is not bad faith. *Cumis Ins. Society, Inc. v. Windsor Bank & Trust Co.,* 736 F.Supp. 1226, 1231–34 (D.Conn.1990). In *Cumis,* the insurer of a credit union that sustained a kite loss sued the winning bank. The facts are similar: the bank suspected a kite and began to dishonor checks drawn against it while continuing to collect on checks drawn on the credit union and deposited with the bank. The bank had even instituted an expedited check clearing procedure specifically to handle drafts drawn on the credit union. *Id.* at 1230. The court refused to impose a good faith duty to disclose the kite:

> There is thus no duty between competing institutions to inform one another of the existence of a check kiting scheme because these institutions deal at arms length, have their own means of detecting check kiting, and, realistically, need no protection from other institutions.

*Id.* at 1233. The court identified several exceptions to this general rule: (1) where a fiduciary or confidential relationship exists; (2) where a contractual relationship exists; (3) where there is a duty created by law; and (4) where there was fraud or misrepresentation by the defendant bank. *Id.* at 1233; *accord Alta Vista State Bank v. Kobliska,* 897 F.2d 930, 933–34 (8th Cir.1990); *Mid–Cal Nat'l Bank v. Federal Reserve Bank,* 590 F.2d 761, 764 (9th Cir.1979) (holding that a bank owes no legal duty to another bank to discover a kite); *Schwegmann Bank & Trust Co. v. Bank of La.,* 595 So.2d 1185 (La.Ct. App.), *writ denied,* 598 So.2d 360 (La.1992).

Colonial relies solely on *Toronto–Dominion Bank v. Central Nat'l Bank & Trust Co.,* 753 F.2d 66 (8th Cir.1985) to support its argument that a lack of good faith by the depositary bank can relieve a payor bank of liability for missing the midnight deadline in a check kiting case.[12] In *Toronto–Dominion,* a depository bank sued under § 4–302 a payor bank which had retained checks beyond the midnight deadline. *Id.* at 67. The payor bank argued that the depositary bank's lack of good faith relieved it of liability. *Id.* at 68. However, the bad faith activity consisted of the depositary bank's manager actually assisting the kiter in carrying out the kite. *Id.* at 67, 70. The Eighth Circuit said that on remand the district court should determine whether this lack of good faith caused or induced the payor bank to miss its midnight deadline. *Id.* at 70. If it did, the depositary bank could be relieved of § 4–302 liability. *Id.*

The *Toronto–Dominion* court did not face the question of good faith that is, as here, usually posed in a check kiting case—whether lawful attempts to shift the kite loss constitute bad faith. Rather, *Toronto–Dominion* dealt with a situation in which the depositary bank, through its employee, actually participated in the kite. Whether this fraudulent conduct can defeat a § 4–302 accountability claim is a different question from whether a bank's exercise of its lawful right to pay or return checks can defeat such a claim. We agree with *Citizens, Cumis,* and the other cases holding that a depositary bank that attempts to shift the loss of a kite does not act in bad faith so as to defeat its § 4–302 accountability claim.

■ The facts here amount to, at most, an attempt by First National to shift the kite loss to Colonial. First, as First National points out, wire notice is a legally permissible method of notifying another bank of a large return. 12 C.F.R. § 229.33(a). In addition, First National has presented evidence that notifying other banks of large returns by wire rather than by telephone was its usual practice.[13]

---

**12.** We note that the *Toronto–Dominion* court held only that it lacked jurisdiction over the case before it because the district court did not enter a final judgment. 753 F.2d at 67. The court expressed its opinions about good faith in dicta. *Id.* at 70.

**13.** Colonial tries to create an issue of fact regarding the propriety of First National's notification of the return by Fed Wire, rather than by telephone. David Spiewak testified that all banks in the Pinnacle group commonly give notice of large returns by Fed Wire. Deposition of David Spiewak (Pl.Ex. 14) at 77–78. To contradict that testimony, Colonial submits the affidavit of Joanne Topham, its Cashier, which states:

> It is very unusual to be notified of returned items by wire. This is so because every financial institution endeavors to provide the quickest and most efficient method of providing notice to other banks. Under § 229.33 of Reg-

Although Colonial makes much of the fact that First National returned the First National checks marked "refer to maker" rather than "uncollected funds," the parties agree that "refer to maker" is a legally permissible reason for returning a check. And Colonial had contacted the maker, World Commodities, and its counsel, receiving assurances that the checks were good. Def. Add'l Facts ¶¶ 11, 12. As to First National's delay in informing Colonial of the return, it is undisputed that First National notified a Colonial employee at 9:30 a.m. on Wednesday, February 12, that it would be returning certain checks, although it notified the wrong employee and did not specify the number or dollar amounts of those checks. Def. Add'l Facts ¶¶ 6, 7, 8. But First National sent the wire notice later the same day stating that seventeen checks totalling $1,518,642.86 were being returned "refer to maker." Even if, as Colonial contends, First National officers decided to return the checks on Tuesday rather than Wednesday, Colonial had notice more than twelve hours before the midnight deadline that checks drawn on the Shelly account were being returned. And even though Colonial was not able to contact First National on Wednesday, Colonial knew on that day that the First National checks were being returned and that the midnight deadline for the Colonial checks was rapidly approaching.

All of First National's conduct regarding the First National checks was proper under the applicable laws. First National had the right to present the Colonial checks for payment and the right to return the First National checks. At most, First National took advantage of these laws and regulations to attempt to shift the kite loss onto Colonial. But even if this is what happened, such conduct does not constitute bad faith.

First National and Colonial were faced with the same dilemma at the same time: a number of checks totalling a goodly sum of money drawn on the account of a customer with low collected funds balances. First National chose to return the checks unpaid, but

---

ulation CC, as well as the common practice among banks in the Chicago metropolitan area, a bank returning a check in excess of $2,500.00 provides the following information by telephone at the earliest possible moment. . . .

Affidavit of Joanne Topham ¶ 5 (Def.Ex. E). However, Topham gave the following testimony during her deposition:

Q. What is your understanding of how that notice [of large item returns] can be accomplished?

A. You can either call or wire. Fed wire system.

\* \* \* \* \* \*

Q. . . . If a large item was being returned to Colonial, how and where was notice received?

A. Same method, either wire or phone. Those are the two acceptable methods of notification.

\* \* \* \* \* \*

Q. Did Colonial Bank ever receive Fed wire notice of returns?

A. Yes, it did.

Q. Without this transaction, without the World Commodities transaction, did it receive Fed wire notice at any other time that you recall?

A. Yes. There are certain institutions that use the Fed wire system, and there are other institutions that use telephone. And so if in fact your customers are doing business with them, that's typically how.

Q. Who, if you recall, would routinely use Fed wire?

A. I can't answer that. I don't really, off the top of my head, which institutions, I don't know. I would have to go back and look at records. Copies of all of this is retained.

Q. Ballpark, how many telephone calls of notification would your operations people receive a day?

A. Five to six maybe. That's going to vary by day of week.

\* \* \* \* \* \*

Q. How frequently would Colonial Bank in 1992 receive a Fed wire notice of returns?

A. I honestly don't know without going and looking.

Q. Once a week, twice a week, five times a week?

A. More than once a week.

Q. But not as frequently as a telephone call?

A. Correct.

Deposition of Joanne Topham (Pl.Ex. 17) at 85–92.

A party cannot create a factual dispute by submitting an affidavit that contradicts her own earlier deposition statement without explaining the contradiction or attempting to resolve the disparity. *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 235 (7th Cir.1991); *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861–62 (7th Cir.1985). Topham's deposition testimony contradicts her affidavit testimony that it is "very unusual" for a bank to use Fed Wire to notify of a large item return. Her affidavit does not explain the contradiction or attempt to resolve the disparity.

Colonial chose to trust its customer to cover the checks. By the time Colonial realized that its decision was wrong, it was too late— the midnight deadline had passed and the checks were paid. Each bank made a business decision; First National's turned out to be the correct one.

### C. Mistake and Restitution

█ The revised UCC § 3–418 sets out rules governing restitution in the event a bank mistakenly pays a negotiable instrument. Colonial argues that the provisions of § 3–418 apply to it and override § 4–302 accountability. Section 3–418 provides:

(a) Except as provided in subsection (c), if the drawee of a draft pays or accepts the draft and the drawee acted on the mistaken belief that (i) payment of the draft had not been stopped under Section 4–403 or (ii) the signature of the drawer of the draft was authorized, the drawee may recover the amount of the draft from the person to whom or for whose benefit payment was made or, in the case of acceptance, may revoke the acceptance. Rights of the drawee under this subsection are not affected by failure of the drawee to exercise ordinary care in paying or accepting the draft.

(b) Except as provided in subsection (c), if an instrument has been paid or accepted by mistake and the case is not covered by subsection (a), the person paying or accepting may, to the extent permitted by law governing mistake and restitution, (i) recover the payment from the person to whom or for whose benefit payment was made or (ii) in the case of acceptance, may revoke the acceptance.

(c) The remedies provided in subsection (a) or (b) may not be asserted against a person who took the instrument in good faith and for value or who in good faith changed position in reliance on the payment or acceptance.

§ 3–418. There was some doubt before the revision to Article 3 whether this restitution provision overrode the accountability provisions of Article 4, that is, whether a payor bank could recover for a mistaken payment even after passage of the midnight deadline.[14] Compare *National Sav. & Trust Co. v. Park Corp.*, 722 F.2d 1303 (6th Cir.1983) (holding that restitution for mistaken payment is available to bank that holds checks beyond midnight deadline), *cert. denied*, 466 U.S. 939, 104 S.Ct. 1916, 80 L.Ed.2d 464 (1984), with *Northwestern Nat'l Ins. Co. v. Midland Nat'l Bank*, 292 N.W.2d 591 (Wis. 1980) (holding that restitution for mistaken payment is not available to bank that holds check beyond the midnight deadline); *State & Sav. Bank v. Meeker*, 469 N.E.2d 55 (Ind. Ct.App.1984) (same). Official Comment 4 to the revised § 3–418 makes it clear that the right of a drawee to recover a mistaken payment is not affected by the Article 4 rules that determine when an item is finally paid. § 3–418 Official Comment 4. Therefore, Colonial's retention of the Colonial checks beyond the midnight deadline is no bar to its ability to recover a mistaken payment.

Subsection (c) of § 3–418 provides that a drawee cannot seek restitution against a person who took the check in good faith and for value or who in good faith relied on payment. In a check kiting scheme, does a depositary bank that suspects a kite take payment of checks in good faith and for value? The drafters of the revised § 3–418 take no position on this question:

In some cases, however, it may not be clear whether a drawee bank should have a right of restitution. For example, a check-kiting scheme may involve a large number of checks drawn on a number of different banks in which the drawer's credit balances are based on uncollected funds represented by fraudulently drawn checks. No attempt is made in Section 3–418 to

**14.** The revision substantially rewrote § 3–418, which formerly read:

Except for recovery of bank payments as provided in the Article on Bank Deposits and Collections (Article 4) and except for liability for breach of warranty on presentment under the preceding section, payment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment.

Illinois adopted the Revised § 3–418 effective January 1, 1992. 810 ILCS § 5/3–418 Historical and Statutory Notes.

state rules for determining the conflicting claims of the various banks that may be victimized by such a scheme. Rather, such cases are better resolved on the basis of general principles of law and the particular facts presented in the litigation.

§ 3–418 Official Comment 3.

In order for Colonial to seek refuge under the restitution principles of the revised § 3–418, two questions must be answered. First, was Colonial's payment of the Colonial checks a payment by mistake under subsection (a) or (b)? Second, if payment was by mistake, did First National take the Colonial checks in good faith and for value, or rely on payment, so as to defeat Colonial's restitution claim as provided in subsection (c)?

Subsection (a) only applies to mistaken payments on forged checks and checks on which the drawer has stopped payment, so it has no application here. Subsection (b) is a catchall, allowing restitution where "an instrument has been paid or accepted by mistake and the case is not covered by subsection (a)." § 3–418(b). Was Colonial's retention of the Colonial checks beyond the midnight deadline payment by *mistake?*

Several commentators take the position that a losing bank in a check kite has made a conscious extension of unsecured credit to its customer, and has not made a "mistaken payment" under § 3–418. "The decision to allow a customer to draw against uncollected funds is basically a credit decision." Clark, *supra*, ¶ 5.03[5]. Professors White and Summers agree:[15]

> In these cases, one bank ends the kite by dishonoring a large number of checks. After the dust has settled one bank may sue the other in restitution on the other checks previously paid. It will argue, of course, that it made payment in the mistaken belief that there were or would be sufficient funds.
>
> Is this a case in which one should allow restitution? We think not. In a typical

kite it is difficult to maintain that one of the banks is more at fault than another. Moreover, the fact that one bank has decided not to honor checks drawn against uncollected funds is not proof of its knowledge that the other bank's payment is "mistaken." It is hard to see how society is benefitted by spending a good deal of money on lawyers' fees at the conclusion of the kite, even in a fruitful attempt to shift the loss from one bank to another. All are culpable.

White & Summers, *supra*, ¶ 17–2.

■ Colonial does not explain why its retention of the Colonial checks beyond the midnight deadline was a payment by mistake that would put its actions within the ambit of § 4–318(b). It is undisputed that after Colonial received notice of the return of the First National checks at 2:45 p.m. on Wednesday, Colonial officers immediately began investigating the Colonial account. Pl. 12(M) ¶¶ 32, 33. Randall Soderman, a Colonial loan officer, realized that Colonial had to return the Colonial checks by midnight the same day or risk losing the money. Pl. 12(M) ¶ 33. He knew that returning the Colonial checks before midnight would protect Colonial, but would risk disappointing its customer, World Commodities. Pl. 12(M) ¶ 34. Anthony Schiller, the loan officer in charge of the World Commodities account, had called World Commodities comptroller Charles Patterson and its attorney Alan Jay Goldstein. Def. Add'l Facts ¶¶ 11, 12. Both assured Schiller that the First National checks were good and should be redeposited. Def. Add'l Facts ¶¶ 11, 12. The Colonial officers decided not to return the Colonial checks on Wednesday but rather to meet on Thursday morning to discuss the matter. Pl. 12(M) ¶ 47.

It is not surprising that Colonial does not argue that these facts constitute a payment by mistake. Colonial was well aware that the midnight deadline for the Colonial checks

---

15. There is no mistake when a bank chooses to pay an instrument against uncollected funds or against an overdrawn account. Here the bank makes a conscious judgment to make a loan to its customer in the belief the customer is good for it. If the bank is mistaken about its customer's creditworthiness, that is not a *payment* by mistake, but rather a *credit* mistake and the bank has no right to restitution. 1B James J. White & Robert S. Summers, *Uniform Commercial Code* § 17–2 (3d ed. 1993).

was approaching, but deferred the decision of whether to return them until the next day. It contacted its customer and received assurances that the returned First National checks were good. Under these facts, Colonial cannot be said to have paid the Colonial checks by mistake so as to allow it to rely on the mistaken payment rules of § 4–318.

Rather than showing that it paid the checks by mistake, Colonial skips ahead to the inquiry under subsection (c), namely, whether First National took in good faith and for value or changed its position in reliance on payment. Colonial cites several cases for the proposition that a depositary bank with suspicion or knowledge of a kite that forwards checks for payment is not a holder in due course of those checks. *Farmers & Merchants State Bank v. Western Bank,* 841 F.2d 1433 (9th Cir.1987); *Community Bank v. Ell,* 278 Or. 417, 564 P.2d 685 (1977). (Colonial's argument is based upon cases decided under the former § 3–418, where the only question was whether the plaintiff was a holder in due course or a good faith relier on payment. But the revision to § 3–418(c) omits the "holder in due course" language in favor of "a person who in good faith took the instrument for value.") But it is unnecessary to inquire whether First National took in good faith and for value under subsection (c), because Colonial has not shown that it made a mistaken payment under subsection (b).

### D. Damages

Let us return to the sticking point of the court's earlier ruling—damages. Summary judgment was denied First National because the court was not satisfied that it had been damaged, and held that it might be unjustly enriched if it were to recover from Colonial. 831 F.Supp. at 641. On this motion, First

National has presented evidence showing that it has suffered a loss from the Shelly/World Commodities check kite.

At some point during the operation of the kite, the kiters siphoned funds out of the banking system, and because Colonial returned the Colonial checks to First National, the loss fell on First National.[16] Specifically, the Reserve Bank debited First National's Reserve Bank account in the amount of the return, $1,523,892.49. This caused First National to make ledger entries reflecting the debit to the Reserve Bank account and a reduction in First National's assets. Pl. 12(M) ¶ 72.[17] But as we have held, Colonial's return was improperly late, and § 4–302 directs that it bear the loss here.

■ The next question is the amount for which Colonial is liable. Section 4–302 makes Colonial liable in the face amount of the checks. However, where the payee has mitigated its damages (as in the case of a payee bank recovering from the drawer of the check), the payor's liability is reduced by the amount mitigated. *State & Sav. Bank v. Meeker,* 469 N.E.2d 55, 59 (Ind.Ct.App.1984). Otherwise, the payee would be unjustly enriched by the full recovery. § 1–103. In this case, then, First National is entitled to the face amount of the Colonial checks ($1,523,892.49) less any amount it recovered from Shelly, its customer.

The parties dispute how much First National recovered from its customer. In addition to the checking account, Shelly also maintained a line of credit with First National. During the months of March, April, and May 1992, First National received $676,757.30 in loan payments. Pl. 12(M) ¶ 73. First National also applied to the loan balance $42,463.38 that remained in the Shelly checking account when it was closed on Feb-

---

**16.** The defendants present evidence that the funds were siphoned from the system during the spring and summer of 1991, before the Colonial account was even opened. Def. 12(M) ¶ 13. But when the funds were siphoned is not the issue; such an inquiry would lead to questions about whether Colonial is at fault for the loss. As explained in the text, the relevant principles here are Colonial's liability in the face amount of the checks reduced by any amount by which First National would be unjustly enriched.

**17.** Had the Shelly account still been open when the Reserve Bank debited First National's account, First National says that it would have charged the debit to the Shelly account, causing an overdraft in the account. Pl. 12(M) ¶ 71. The defendants deny that First National could have charged the debit to the Shelly account because there were never any collected funds in that account. Def. 12(N) ¶ 71. But the result is the same either way—First National took the loss.

ruary 28. Pl. 12(M) ¶ 69; Def. 12(N) ¶ 73. The defendants say, then, that First National actually received $719,220.68 from Shelly after the kite crashed—the $676,757.30 in loan payments plus $42,463.38 that remained in the Shelly checking account. Def. 12(N) ¶ 73.

Colonial says that First National's recovery should be reduced by $719,220.68. But Colonial has presented no evidence to refute First National's evidence that it applied the $719,220.68 to pay off the loan. This being the case, First National will not be unjustly enriched by recovering the face amount of the checks from Colonial. However, First National submits a report of Arthur Andersen & Co. saying that the funds from Shelly were sufficient to pay off the loan and reduce the loss from the kite, leaving it with an actual loss of $1,425,970.61. Pl. 12(M) ¶ 73.[18] If First National's recovery is reduced to avoid unjust enrichment, it is entitled to recover $1,425,970.61, plus interest, which represents the face amount of the Colonial checks offset by any recovery from Shelly that exceeded the amount necessary to pay off the loan.

First National has also requested that it be awarded prejudgment interest. First Nat'l Brief in Support of Summary Judgment at 23. Colonial may file a brief responding to First National's prayer for interest by July 28, 1995. First National may file a reply by August 11, 1995. The court will delay entering final judgment until the matter of interest is decided.

## II. Count III: Alleged Breach of Duty of Ordinary Care by Colonial

First National alleges that Colonial breached its duty of ordinary care with re-

18. The defendants submit the affidavit of Dennis Irvin, president of First National, which says that after the funds were applied to the loan balance, there remained unpaid principal and interest totalling $41,356.91. Def. 12(N) ¶ 73. However, this does not create a genuine issue of material fact. Defendants' submission of the Irvin affidavit creates the odd situation of the defendants saying that the plaintiff's loss is greater than the plaintiff contends it is: if there were no surplus after paying off the loan, First National would be entitled to a higher recovery.

19. The claim against the Reserve Bank is brought through Regulation J, which provides:

spect to its return of the Colonial checks. Regulation CC provides:

A bank shall exercise ordinary care and act in good faith in complying with the requirements of this subpart. A bank that fails to exercise ordinary care or act in good faith under this subpart may be liable to the depositary bank, the depositary bank's customer, the owner of a check, or another party to the check. The measure of damages for failure to exercise ordinary care is the amount of the loss incurred, up to the amount of the check, reduced by the amount of the loss that the party would have incurred even if the bank had exercised ordinary care.

12 C.F.R. § 229.38(a). Under this provision, there must be a causal relationship between the bank's actions and the loss.

Colonial argues, and First National concedes, that First National could not have recovered any of the disputed $1.5 million even if Colonial had returned the Colonial checks by the midnight deadline. First Nat'l Brief in Support of Summary Judgment at 30 n. 13. Because Colonial's late return did not cause First National's loss, First National cannot prevail on its claim for breach of the duty of ordinary care.

## III. Count I: Alleged Breach of Warranty by Colonial Count II: Alleged Breach of Warranty by Reserve Bank

First National alleges breach of warranty counts against both Colonial and the Reserve Bank under Regulation CC,[19] which provides:

A Reserve Bank may be liable to the owner, to the sender, to a prior collecting bank, or to the depositary bank's customer with respect to a check as defined in 12 CFR 229.2(k). A Reserve Bank shall not have or assume any liability with respect to an item or its proceeds except for the Reserve Bank's own lack of good faith or failure to exercise ordinary care, except as provided in paragraph (b) of this section and except as provided in subpart C of part 229.

12 C.F.R. § 210.6(a)(1). This section incorporates by reference Regulation CC, including § 229.34.

(a) Warranties. Each paying bank or returning bank that transfers a returned check and receives a settlement or other consideration for it warrants to the transferee returning bank, to any subsequent returning bank, to the depositary bank, and to the owner of the check, that—

(1) The paying bank, or in the case of a check payable by a bank and payable through another bank, the bank by which the check is payable, returned the check within its deadline under the U.C.C. Regulation J (12 CFR part 210), or § 229.30(c) of this part;

\* \* \* \* \* \*

(d) Damages. Damages for breach of these warranties shall not exceed the consideration received by the bank that presents or transfers a check or returned check, plus interest compensation and expenses related to the check or returned check, if any.

12 C.F.R. § 229.34. The Commentary to Regulation CC, 12 C.F.R. pt. 229, app. E, indicates that the damages under § 229.34(d) are the warranty damages of UCC § 4–207(c): "an amount equal to the loss suffered as a result of the breach. . . ." As discussed in the preceding section, First National's loss was not caused by Colonial's late return of the checks.

Despite its admitted lack of damages suffered as a result of the breach, First National contends that it may recover its attorneys fees under the provision of § 229.34(d) that allows recovery of "expenses." In Illinois, it is within the trial court's discretion to award attorney's fees as "expenses" under § 4–207(c). *Southern Provisions, Inc. v. Harris Trust & Sav. Bank,* 96 Ill.App.3d 745, 52 Ill.Dec. 352, 354, 422 N.E.2d 33, 35 (Ill.App. Ct.1981). First National cites no case in which a court has ever awarded attorneys fees as "expenses" in the absence of actual damages. We cannot see why a litigant who cannot establish liability for breach of warranty because it has suffered no damages as a result of the breach should recover attorneys fees as expenses.

**IV.** *Count IV: Breach of Duty of Ordinary Care Against Reserve Bank Count VI: Breach of Contract Against Reserve Bank Count VII: Breach of Contract Against Colonial*

First National's remaining three counts are based upon the Reserve Bank's and Colonial's alleged failure to follow the terms of the dispute resolution procedures contained in the Reserve Bank's Operating Circular No. 4 ("OC–4"). First National alleges a breach of duty of ordinary care claim against the Reserve Bank, and a breach of contract claim against each of the defendants.

Circular OC–4 sets up the Reserve Bank's "Disputed Return Procedure." It provides that if a depositary bank believes that the paying bank has returned a check after the midnight deadline, the depositary bank may dispute the return by sending the Reserve Bank the returned check and a signed statement that the bank believes the paying bank did not return the check within the midnight deadline. When the Reserve Bank receives the statement, it credits the amount of the returned check to the bank's account. It also charges the paying bank's account the amount of the check, and sends the returned check and statement to the paying bank. OC–4 ¶ 48 (Pl.Ex. 38). Circular OC–4 further provides that the Reserve Bank will revoke the credit given to the disputing bank and recredit the paying bank if it receives a form from the paying bank that (i) states that the paying bank returned the check within the midnight deadline; and (ii) shows the banking day of receipt and the date of return, and "explains any difference in dates exceeding one banking day." *Id.* ¶ 49.

First National contends that because the Response Forms submitted by Colonial did not contain a statement explaining why the differences in the date of receipt and the date of return exceeded one banking day, the Reserve Bank should not have processed them. But the Reserve Bank points to a provision of OC–4 which states that the Reserve Bank "assume[s] no responsibility for determining whether the paying bank returned the check within" the midnight deadline. *Id.* ¶ 50. First National replies that

this section does not absolve the Reserve Bank from following its own guidelines and ensuring that all response forms are properly and thoroughly completed. It points to an internal Reserve Bank memorandum that states:

Reserve Banks will not examine the items in question, verify the accuracy of the information provided, or verify the statements of alleged facts to ascertain the validity of the claims in carrying out this procedure. However, the Reserve Banks should monitor the timeliness and completeness of these claim forms and respond to them within 5 business days.

Pl.Ex. 37. By accepting the Response Forms and reversing the debit to the Colonial account and the credit to the First National account, First National says the Reserve Bank caused it to suffer $1,523,892.49 in damages (plus interest and legal expenses). Because Colonial submitted the incomplete Response Forms, and the Reserve Bank processed those forms, First National seeks to hold them liable for violating OC–4.

But First National has cited no authority holding a bank liable under an operating circular on a negligence or breach of contract theory. And at least one court has concluded that operating circulars do not create any substantive rights. *Continental Ill. Nat'l Bank & Trust Co. v. Sterling Nat'l Bank & Trust Co.*, 565 F.Supp. 101, 103 (S.D.N.Y. 1983). We agree, and hold that First National may not bring either a negligence or breach of contract claim against either Colonial or the Reserve Bank for their alleged failures to follow the terms of OC–4.

### CONCLUSION

For the reasons explained, plaintiff First National's motion for summary judgment is granted as to Count V of the first amended complaint and denied as to Counts I, II, III, IV, VI and VII. The Reserve Bank's motion for summary judgment is granted as to Counts II, IV and VI. Colonial's motion for summary judgment is granted as to Counts I, III and VII and denied as to Count V.

Colonial may file a brief responding to First National's prayer for interest by July 28, 1995. First National may file a reply by August 11, 1995. The court will delay enter-

ing final judgment until the matter of interest is decided.