In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3872

FROST NATIONAL BANK,

Plaintiff-Appellant,

v.

MIDWEST AUTOHAUS, INC., ROBERT P. GEEKIE, JR.,
FIRST OF AMERICA BANK-ILLINOIS, N.A. n/k/a
NATIONAL CITY BANK OF MICHIGAN/ILLINOIS, and
MICHELLE GEEKIE,

Defendants-Appellees.


Appeal from the United States District Court
for the Central District of Illinois.
No. 95 C 2150--Michael P. McCuskey, Judge.


Argued September 15, 2000--Decided February 23, 2001


   Before Flaum, Chief Judge, Kanne and Williams,
Circuit Judges.

   Kanne, Circuit Judge.  This case arises from the
collapse of a check kiting scheme operated by
account holders at Frost National Bank ("Frost"),
plaintiff-appellant, and First of America Bank-
Illinois ("FOA"), defendant-appellee. Frost asks
us to find that the district court erroneously
granted FOA's motion for summary judgment,
dismissing Frost's claims accusing FOA of acting
unlawfully in dealing with the scheme operated by
Robert Geekie ("Geekie") and Peter Parker
("Parker"). Frost disputes the district court's
ruling generally, arguing that the court
improperly construed the evidence presented in
the light most favorable to FOA when determining
whether to grant FOA's motion for summary
judgment. Additionally, Frost challenges certain
specific findings of the court, including its
conclusion that FOA did not violate 18 U.S.C.
sec. 1962(d), the conspiracy provision of the
Racketeer Influenced and Corrupt Organizations
Act ("RICO"), and that FOA did not breach its
duty of good faith imposed by section 4-103 of
the Illinois Uniform Commercial Code. We find
that the district court properly construed the
evidence in this case, and we agree with the
court's determination regarding Frost's specific
claims. We therefore affirm the decision of the
district court.

I.  History

   Defendants Geekie and Parker operated a check kiting scheme through their respective automobile dealerships, Midwest Autohaus ("Midwest") and Rovers Southwest ("Southwest"). Geekie, using the Midwest account at FOA,/1 and Parker, through the Southwest account at Frost,/2 effectuated their scheme by continuously repeating a cycle of writing checks to each other for amounts their actual account balances could not cover, and then depositing each other's checks into their respective accounts. FOA and Frost would then provisionally credit Geekie and Parker's accounts based on these deposits, thereby covering the checks they had just written to one another and enabling them to write other checks as well. This cycle, until it was eventually detected and collapsed, allowed Geekie and Parker to borrow their banks' money interest free.

   While the nature of Frost's claims requires us to focus primarily on the relationship between FOA and Geekie and the steps FOA took to deal with the suspected kite, we will also discuss relevant facts relating to the relationship between Frost and Parker.

   FOA's lending relationship with Geekie and Midwest began in 1984 and steadily developed to the point that FOA provided financing for vehicle purchases of individual Midwest customers. This line of credit matured in November 1994, however, and it was not renewed by FOA because Geekie failed to provide certain financial records needed to evaluate the credit risk. FOA's credit file on Geekie also expressed concerns regarding the location and identity of some of Midwest's automobiles and some overdrafts in the Midwest account.

   Additionally, the Midwest account often showed negative collected balances. An account's collected balance is based on a bank computer's estimate of how long it will take to collect items deposited into the account through the banking system. Collection usually takes between one and five days. These negative collected balances meant that despite the Midwest account's positive ledger balance--the balance based on all deposits made into the account minus checks paid from the account--the deposits making up that balance had not been collected through the Federal Reserve System. Nevertheless, FOA consistently allowed Geekie to draw on these uncollected balances. Eventually, FOA told Geekie that it would charge him interest on the average uncollected balances because the uncollected balances were "like an unsecured loan." In spite

of this warning, however, FOA never did charge the Midwest account any interest.

At the same time, FOA received check-clearing services from First of America Service ("FAS"). FAS employs the Vector 9 Check Kite Suspect Computer System in processing each customer's account, looking for and identifying suspicious activity. FAS reviews each account that is identified as suspicious to determine if the activity warrants further investigation. When FAS finds sufficient evidence of a possible kite, it notifies the bank that holds the account. After FAS notifies a bank about a specific account, that bank will sign off on that customer's account if it determines that the activity of the account is legitimate. Once a bank signs off on a customer's account, FAS will not refer the account to that bank again. In the first few months of 1995, the Midwest account appeared on the Vector 9 computer system nearly every day. FAS referred the account to FOA as a possible kite situation and FOA signed off on the Midwest account. Frost had a similar detection system in place. Frost received Kite Research Reports which can indicate suspicious activity that might be associated with a check kiting scheme. Parker's Southwest account appeared on Frost's Kite Research System Reports forty-three times from January to mid-May of 1995.

In May of 1995, after months of tolerating Geekie's use of the Midwest account, events transpired causing FOA to respond swiftly to the suspicious activity surrounding the Midwest account. On May 11, one of Geekie's employees requested a $50,000 cashier's check from FOA. In processing this request, the teller assisting the employee discovered that the Midwest account had a negative collected balance. Seeing this uncollected balance, the teller sought approval from a supervisor on whether to issue the cashier's check. Michael Gordon ("Gordon"), the officer in charge of the Midwest account, was unavailable, but another officer instructed the teller to deny the request because of the uncollected balance. Gordon was subsequently made aware of this incident by the officer who instructed the teller to deny the request, and at that time Gordon proceeded to examine the Midwest account.

The Midwest account exhibited a frequent and growing disparity between a large positive ledger balance and an even larger uncollected balance. Additionally, Gordon observed checks totaling unusually large amounts of money being deposited into the Midwest account in very short periods of time. Despite previous financial statements totaling Midwest's annual sales at $7.2 million,

the Midwest account had received $11 million in deposits during just the first ten days of May 1995. Furthermore, two days earlier, Frost had returned eight checks drawn on Parker's Southwest account at Frost totaling $701,800, refusing to pay FOA because of insufficient funds in the Southwest account. These returned checks were charged against Midwest's account at FOA.

Concerned with the state of the Midwest account and the activity surrounding it, Gordon approached FOA's regional bank president, Jeff Smith ("Smith") with the information he had compiled. The two officers examined the account's activity to determine whether the significant increase in deposits was the result of legitimate business transactions. Smith and Gordon recognized that the uncollected funds balance in the Midwest account had grown substantially over the past six months. After reviewing Midwest's account information, Smith and Gordon suspected that $10 million dollars worth of checks deposited into Midwest's account were not legitimate. Almost $5.5 million of the $6.6 million deposited into the Midwest account in just the four days prior to Smith and Gordon's examination came from checks that had been drawn on the accounts of only three businesses. Additionally, these same three businesses were the recent recipients of checks drawn on the Midwest account totaling some $5.2 million.

Smith worried that Geekie might be running a check kiting scheme that could potentially harm FOA. FOA would sustain heavy losses if it were unable to collect the funds apparently deposited into the Midwest account that Geekie was in turn using as a basis to draw and distribute equally large checks on the Midwest account. The possibility of this result led Smith and Gordon to decide that FOA would not pay any checks drawn on the Midwest account until the deposits supposedly made into the Midwest account were actually collected. On May 11, Smith and Gordon placed a "hard hold" on the Midwest account. This "hard hold" prevented all activity other than deposits and caused all transactions to fall out for review before posting on the account. Additionally, placing this hold on the account instructed FAS to return any checks posted that day or the day before.

While FOA officials were suspicious of Geekie's activities, they were still apprehensive of falsely accusing Geekie of running a check kiting scheme and possibly putting him out of business. Thus, Smith and Gordon met with Geekie on May 12 to give him an opportunity to explain the current state of the Midwest account and the suspicious activity being conducted through the account.

Phil Carter ("Carter"), FOA's attorney, took part in the meeting over the telephone and Geekie was unwilling to talk about the Midwest account without his own attorney present once he learned that Carter was participating. At this time, Smith and Gordon gave Geekie a letter explaining that a "hard hold" was being placed on the Midwest account, and that all funds deposited by check on or after May 5 would be unavailable until the eleventh business day following the date of deposit. Additionally the letter indicated that the Midwest account would be closed at the end of business that day. Geekie did not admit to his participation in a check kiting scheme.

On May 15, Smith opened up a holding account, to which he transferred Midwest's uncollected funds. Geekie could only access these funds once they were actually collected. That day, Smith, Gordon, and Carter met with Geekie and his attorney, Roger Elliot ("Elliot"), to talk about the Midwest account. Elliot threatened to sue FOA for wrongfully interfering with Geekie's business and his legitimate business transactions. Elliot also complained that FOA had always allowed a negative collected funds balance in the Midwest account, and that its new policy was arbitrary. Again, Geekie did not disclose to Smith, Gordon, or Carter that he was operating a check kiting scheme.

Carter sent Geekie's attorney a letter explaining the terms under which FOA would release money from the holding account to Geekie. Geekie agreed to the provisions set forth in the letter, but again did not disclose that he had been operating a check kiting scheme. The terms of the agreement explained that once the provisional credits in the holding account were collected through the Federal Reserve System, and all of the claims through the Federal Reserve System were settled or to be settled, Geekie could have access to the remaining funds. Ultimately, $477,800.93 was released to Geekie, who subsequently arranged for FOA to wire transfer the funds to the account of Mid-America Exotic Auto Sales, Inc. ("Mid-America"), owned by George Ventura, at Commercial State Bank of Bonner Springs, Kansas./3

The steps FOA took to deal with the suspected kite, including refusing to pay checks presented to FOA for payment that had been drawn on the Midwest account until sufficient actual collected deposits had been cleared through the Federal Reserve System, shifted the losses that usually accompanies the collapse of a check kiting scheme to Frost. Before FOA acted on its suspicions, Parker had deposited checks from Geekie and the

Midwest account into the Southwest account. Based on these deposits, Frost issued provisional credits to the Southwest account, and Parker drew on these credits. On May 12 and May 15, FOA returned a total of sixteen checks drawn on the Midwest account that Frost had presented for payment to the Federal Reserve Bank of Chicago because of insufficient funds in Geekie's account. FOA posted notices of its decision not to pay these checks on the Electronic Advance Return Notification System ("EARNS"), a computer program banks use to notify and receive notice of non-payment of checks.

When Frost picked up the notice through the EARNS system indicating the first set of items that were returned, the account officer for the Southwest account at Frost notified Parker. Parker told the officer that he did not know why the checks were returned. The account officer instructed her subordinates to resubmit the checks. When Frost received notice through the EARNS system of the second set of returns the account officer again confronted Parker about these returned checks, and Parker again indicated that he did not know why FOA was refusing to pay Midwest's checks. On May 17, Frost put a hold on Parker's account. Additionally, after this second set of returned checks, an officer from Frost contacted Smith at FOA inquiring about the returned checks. Smith refused to discuss the Midwest account because of FOA's policy of not discussing customer account information with anyone outside of FOA. Frost revoked the provisional credits it had issued based on the deposit of these sixteen items, which Parker had already drawn on, creating an overdraft in the Southwest account. This overdraft caused Frost to suffer a loss of $796,552.16.

Parker and Geekie were eventually indicted for criminal bank fraud and for abetting bank fraud. Both pleaded guilty, and Geekie admitted orchestrating the scheme.

On May 26, 1995, Frost filed a Complaint for damages, declaratory judgment, and equitable relief against Geekie, Midwest, Parker/4 and FOA in the United States District Court for the Central District of Illinois pursuant to 28 U.S.C. sec.sec. 1331, 1332, and 2201. While there were other legal proceedings involving the various parties in this case, most relevant to this appeal are the claims Frost filed against FOA in its first amended complaint alleging wrongful dishonor of checks drawn on Geekie's account, breach of fiduciary duty, violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of the duty of good faith, and violation of the Expedited Funds

Availability Act ("EFA Act"). FOA filed a motion for summary judgment addressing all of these claims. Frost sought leave to file a second amended complaint, in which it altered its allegation under the RICO statute from a violation of 18 U.S.C. sec. 1962(c), to a violation 18 U.S.C. sec. 1962(d), the conspiracy provision of the RICO statute.

The district court took Frost's revision of its RICO claim into account in ruling on FOA's motion, but nevertheless, on February 26, 1999, finding no genuine issue of material fact as to any of Frost's claims against FOA, the district court granted FOA's motion for summary judgment, dismissing each of Frost's five claims against FOA. Frost filed a timely notice of appeal, and now challenges the manner in which the district court construed the evidence in deciding to grant FOA's motion as well as the court's decision regarding Frost's claim that FOA violated the RICO conspiracy statute, and its claim that FOA breached its duty of good faith under the Illinois Uniform Commercial Code.

II.  Analysis

We review the district court's decision to grant FOA's motion for summary judgment de novo. See Bekker v. Humana Health Plan, Inc., 229 F.3d 662, 669 (7th Cir. 2000). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). When determining whether a genuine issue of material fact exists in this case, we must review the record in the light most favorable to Frost, drawing all reasonable inferences in its favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). If after having drawn all reasonable inferences in Frost's favor we conclude that a reasonable jury could return a verdict for Frost, then a genuine issue of material fact exists and the district court's decision to grant FOA's motion for summary judgment was not proper. See id. at 249-50; see also United States v. 5 S. 351 Tuthill Rd., Naperville, Ill., 233 F.3d 1017, 1024 (7th Cir. 2000). If, however, we determine that no reasonable jury could return a verdict in favor of Frost, then there is no genuine issue of material fact and the district court's decision to grant FOA's motion for summary judgment was proper. See Anderson, 477 U.S. at 249-50.

A.  The District Court's Review of the Evidence

   Frost's first argument on appeal is a general objection to the manner in which the district court reviewed the evidence. Frost argues that in granting FOA's motion for summary judgment, the district court turned the summary judgment process on its head by construing the evidence in the light most favorable to FOA, the moving party, rather than in favor of Frost, the non-moving party. Frost points to specific pieces of evidence urging us to determine that the trial court did not draw proper inferences from this information, and that a proper review dictates a conclusion that there are genuine issues of material fact that must be addressed by a trier of fact.

   This claim blends into Frost's two other claims included in this appeal. The evidence Frost contends that the trial court improperly construed is the same evidence Frost relies on to assert that the district court erred in granting summary judgment on Frost's RICO conspiracy claim and its claim that FOA breached its duty of good faith. For example, Frost points to specific information available to FOA pertaining to the Midwest account, arguing that if the district court had properly drawn all inferences in favor of Frost, then it would have concluded that this information sufficiently implies FOA had knowledge of the check kiting scheme so as to allow Frost's RICO conspiracy claim to survive FOA's motion for summary judgment. Later in its brief, when specifically contesting the district court's decision regarding its RICO conspiracy claim, Frost again asserts this information as proof that FOA had knowledge of Geekie's check kiting scheme. Thus, we find it more efficient and appropriate to discuss the district court's review of the specific evidence presented in this claim within the context of our analysis of Frost's other two claims. We will say, however, that we disagree with Frost's assertion that the district court improperly drew inferences in favor of FOA.

   As we stated above, it is well established that as the non-moving party, Frost was entitled to have the district court review the record as we do now, drawing all reasonable inferences in favor of Frost. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. A court's obligation to draw all reasonable inferences in favor of a non-moving party, however, does not require that court to stretch existing evidence to reach conclusions or bolster arguments it could not otherwise support. This is precisely what Frost has asked us to do here, and therefore, we find no merit in this claim.

B.  Frost's RICO Conspiracy Claim

   Frost's second claim on appeal alleges that, in dealing with Geekie's check kiting scheme, FOA violated the RICO conspiracy statute, 18 U.S.C. sec. 1962(d). Section 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. sec. 1962(d). Frost contends that FOA conspired with Geekie and Parker to violate 18 U.S.C. sec. 1962(c),/5 a crime for which both Geekie and Parker have already been convicted, thereby exposing itself to civil liability under sec. 1962(d).

   With respect to this claim, the district court granted FOA's motion for summary judgment concluding that "[t]here is simply no evidence of any conspiratorial agreement between FOA and the other defendants to carry out the check-kiting scheme." Frost Nat'l Bank v. Parker, No. 95-2150, at 19 (C.D. Ill. Feb. 26, 1999). Frost now asserts that the district court erred by imposing an overly burdensome standard in evaluating Frost's RICO conspiracy claim. Frost argues that our decision in Brouwer v. Raffensperger, Hughes & Co., 199 F.3d 961 (7th Cir. 2000), cert. denied, 120 S. Ct. 2688 (2000), issued subsequent to the district court's decision in this case, articulates a much less stringent standard than that used by the district court. Frost contends that our analysis in Brouwer must be applied to the facts of this case, and that when the analysis is applied, the district court's granting of FOA's motion for summary judgment must be reversed because Frost has proven FOA's culpability under this standard. While we acknowledge that our recent explanation of sec. 1962(d) liability is the proper standard by which Frost's RICO claim against FOA should be evaluated, we do not agree that the application of our analysis in Brouwer leads to a different result in this case.

   Before Brouwer, our long-established, two-part analysis of subsection (d) looked for two separate agreements: "an agreement to conduct or participate in the affairs of an enterprise and an agreement to the commission of at least two predicate acts." United States v. Neapolitan, 791 F.2d 489, 499 (7th Cir. 1986). While this second agreement only requires a person to agree that someone, not necessarily that person, will execute the two predicate acts, our decision in Brouwer clarified the level of personal participation that is required by the first agreement in light of two Supreme Court decisions, Reves v. Ernst & Young, 507 U.S. 170,

113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993), and Salinas v. United States, 522 U.S. 52, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997). See Brouwer, 199 F.3d at 961-67. In Brouwer we explained:

To conspire to commit a subsection (c) offense, one would not need, necessarily, to meet the Reves requirements: one does not need to agree personally to be an operator or manager. On the other hand, one cannot conspire to violate subsection (c) by agreeing that somehow an enterprise should be operated or managed by someone. That would impose a meaningless requirement and cast a frighteningly wide net. Rather, one's agreement must be to knowingly facilitate the activities of the operators or managers to whom subsection (c) applies. One must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner. It is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do.

Id. at 967. We have subsequently reiterated this standard. See United States v. Swan, 224 F.3d 632, 635 (7th Cir. 2000), amended by 230 F.3d 1040 (7th Cir. 2000) (explaining that a guilty jury verdict for a sec. 1962(d) criminal charge could not provide a "finding relating to participation in the management or operation of [an] enterprise" absent from a deficient jury instruction for a sec. 1962(c) charge because a sec. 1962(d) conviction only requires a jury "to find that [an individual] knowingly agreed to facilitate the activities of those operators or managers to whom sec. 1962(c) can apply").

In its order granting FOA's motion for summary judgment, the district court explained our sec. 1962(d) analysis relying on cases that we noted in Brouwer as "continu[ing] to describe in a general way the proper standard." Brouwer, 199 F.3d at 966-67 (referring to Goren v. New Vision Int'l, Inc., 156 F.3d 721 (7th Cir. 1998), MCM Partners v. Andrews-Bartlett & Assocs. 62 F.3d 967 (7th Cir. 1995), United States v. Quintanilla, 2 F.3d 1469 (7th Cir. 1993), United States v. Neapolitan, 791 F.2d 489 (7th Cir. 1986)). Although our analysis in Brouwer subsequently clarified the level of participation required by the agreement "to conduct or participate in the affairs of an enterprise," a standard used by the district court, the district court did not require Frost to show such a level of participation by FOA in the check kiting scheme that its decision was inconsistent with our analysis in Brouwer. The district court specifically cited cases where we have held that a conspirator under sec. 1962(d) does not need to

be an operator or manager. See Frost Nat'l Bank, No. 95-2150, at 17-18 (C.D. Ill. Feb. 26, 1999) (citing MCM Partners, 62 F.3d at 980). Additionally, the district court noted that this court "has stressed that the touchstone of liability under section 1962(d) is an agreement to participate in an endeavor that, if completed, would constitute a violation of the substantive statute." Id. at 18 (citing Goren, 156 F.3d at 732). Most importantly, however, even if the district court did require Frost to show that FOA participated in the check kiting scheme to a greater extent than our standard in Brouwer requires, we conclude that an application of our analysis in Brouwer yields the same result as that reached by the district court.

For FOA to have violated sec. 1962(d), it had to have "knowingly agree[d] to perform services of a kind which facilitate[d]" Geekie and Parker in the operation of their check kiting scheme. Brouwer, 199 F.3d at 967. Frost argues that FOA had knowledge of Geekie's check kiting scheme and knowingly agreed to facilitate Geekie in the operation of the criminal bank fraud. Specifically, Frost alleges that Geekie effectuated the check kiting scheme by transferring the Midwest account into a holding account and selectively paying checks out of that account on Geekie's behalf and at his direction. Frost also contends that FOA assisted the scheme by releasing $477,800.93 from the holding account to Geekie, whom FOA knew was involved in criminal bank fraud, who in turn transferred that money to the company of George Ventura, who was later convicted for participating in the check kiting scheme. After having reviewed all of the evidence in the light most favorable to Frost, we find no such agreement between FOA and Geekie and Parker.

First, Frost mischaracterizes the extent of FOA's knowledge of Geekie's check kiting scheme. FOA became increasingly suspicious of Geekie's use of the Midwest account based on information compiled regarding the activity of that account. Frost points to this information as evidence that FOA had knowledge of the check kiting scheme. Curiously, Frost received information regarding the Southwest account similar to the information which Frost argues is proof that FOA knew that the Midwest account's activity met each and every one of the tell-tale signs of a criminal check kite. Eventually, FOA acted on its suspicions, despite being threatened with a lawsuit by Geekie's attorney, and took steps which the district court correctly noted "[i]f anything, . . . stopped the scheme rather than effectuating it." Frost Nat'l Bank, No. 95-2150, at 19. While we agree with the statement made by FOA's

attorney at oral argument that both parties should probably have caught this scheme sooner, we do not believe that FOA knowingly stood by, allowing the scheme to continue. To the contrary, FOA's actions suggest that as it grew more and more suspicious of a possible scheme, it took appropriate steps to deal with the situation and stop the check kiting scheme.

Secondly, Frost's allegations that FOA facilitated the scheme by operating the holding account and returning the $477,800.93 to Geekie are misplaced remnants of its other claims upon which the district court granted FOA's motion for summary judgment. All of Frost's claims return to one central point: Frost lost money when FOA took steps leading to the collapse of Geekie and Parker's check kiting scheme. Now Frost is trying to recoup this money by accusing FOA of acting unlawfully in dealing with the suspected kite. There is no doubt that FOA acted in its own interest in dealing with Geekie and the Midwest account. FOA attempted to protect itself and avoid incurring substantial losses from the suspected kite even though other financial institutions such as Frost might therefore end up losing money. Specifically relevant in this case are the sixteen checks totaling $1,248,550 presented by Frost that FOA returned in a timely manner so as to avoid having to pay on those checks. The return of these checks created an overdraft in Parker's account causing Frost to sustain a loss of $796,552.16. While Frost is understandably frustrated with the losses it has incurred, its RICO claim against FOA is without merit. FOA did not agree to facilitate any of Geekie's illegal actions. Furthermore, the manner in which FOA proceeded, including its decisions to set up a holding account and return the remainder of collected funds to Geekie after paying all outstanding amounts for which FOA was liable, did not violate any laws. The district court rightly determined that "[t]he only reasonable inference this court can draw from FOA's actions is that FOA wanted to dissolve its association with Geekie as quickly as possible." Frost Nat'l Bank, No. 95-2150, at 19 (C.D. Ill. Feb. 26, 1999). Thus, we conclude that the district court correctly granted FOA's motion for summary judgment regarding Frost's RICO claim.

C.  Frost's Breach of Good Faith and Fair Dealing Claim.

Frost's final argument on appeal disputes the district court's decision to grant FOA's motion for summary judgment on Frost's claim that FOA breached its duty of good faith imposed by section 4-103 of the Illinois Uniform Commercial Code (the "UCC") in its dealings with Frost.

Frost asserts that the district court erred in at least two respects in granting FOA's motion for summary judgment on this claim. Both of these alleged errors relate to the district court's reliance on First Nat'l Bank v. Colonial Bank, 898 F. Supp. 1220 (N.D. Ill. 1995).

Frost first asserts that the district court, following the analysis of Judge Grady in First National Bank, erroneously equated compliance with applicable banking laws and Federal Reserve Regulations with the adherence of the duty of good faith required by Article 4 of the UCC. 810 Ill. Comp. Stat. Ann. 5/4-104(c) (West Supp. 2000). Article 4 of the UCC (Banking Deposits and Collections) adopts the definition of good faith in Article 3, requiring "honesty in fact and the observance of reasonable commercial standards of fair dealing." 810 Ill. Comp. Stat. Ann. 5/3-103(1)(4) (West 1993). Frost argues that this duty of good faith is independent of a bank's obligation to adhere to applicable banking laws and regulations, and that FOA violated this duty.

Subsection (a) of section 4-103 states that "[t]he effect of the provisions of this Article may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care." 810 Ill. Comp. Stat. Ann. 5/4-103(a) (West 1993). Subsection (b) then explains that "Federal Reserve regulations and operating circulars, clearing-house rules, and the like have the effect of agreements under subsection (a), whether or not specifically assented to by all parties interested in items handled." 5/4-103(b). Frost argues that these two statements taken together imply that a duty of good faith is imposed upon a bank in its actions or non-actions taken pursuant to Federal Reserve regulations or other like rules, and that a bank cannot disclaim responsibility for its lack of good faith through compliance with such regulations or rules.

Frost contends that comment 3 to section 4-103 provides further support for this interpretation. Comment 3 notes that while the official or quasi-official rules of collection set out in subsection (b) can "vary the effect of the provisions of Article 4," they are "subject to the good faith and ordinary care limitations." 5/4-103 cmt. 3. Finally, Frost points to subsection (c) of section 4-103 which states that "[a]ction or non-action approved by this Article or pursuant to Federal Reserve regulations or operating circulars is the exercise of ordinary care." 5/4-103(c). Frost argues that the absence of any affirmative statement equating compliance with Article 4 or Federal Reserve regulations

with adherence to one's duty of good faith, similar to subsection (c)'s statement regarding the exercise of ordinary care, is evidence that such compliance is not sufficient to satisfy one's duty of good faith under the UCC.

We do not disagree with Frost's argument that section 4-103 of the UCC implies that a bank's duty of good faith is not satisfied by compliance with Federal Reserve regulations or Article 4 provisions alone. In fact, we do not think that the decision in First National Bank is at odds with this aspect of Frost's argument. In our view, Frost mischaracterizes the analysis employed by the court in First National Bank and followed by the district court in this case. Contrary to Frost's assertion, we find that the court in First National Bank did not simply equate compliance with applicable banking regulations with adherence to one's duty of good faith under the UCC. While First National Bank supports Frost's argument that there is a duty of good faith under the UCC that requires more than just mere compliance with banking regulations, Frost finds itself in a precarious situation.

Like the current case, First National Bank involved two banks trying to pick up the pieces after the collapse of a check kiting scheme. See First Nat'l Bank, 898 F. Supp. at 1223. First National Bank of Harvey ("First National") suspected that one of its customers was involved in a check kiting scheme and therefore decided not to pay checks drawn on that customer's account. See id. at 1224. Instead, First National decided to return those checks to the Federal Reserve Bank of Chicago (the "Reserve Bank"), the clearinghouse through which these checks were processed, and to notify Colonial Bank ("Colonial"), who had presented those checks for payment, that it was returning the checks. See id. First National did not notify Colonial that it was suspicious of a kite, however, as its stated reason for returning the checks was simply "refer to maker." Id. Upon receiving this notice, Colonial investigated the situation and recognized that it stood to lose a significant amount of money if it did not return similar checks drawn on a Colonial account that First National had presented for payment. See id. After hesitating at first, Colonial returned these checks to the Reserve Bank and notified First National. See id. First National protested this attempted return, arguing that Colonial had not returned the checks by the midnight deadline imposed by Article 4 of the UCC./6 Id. Over First National's objections the Reserve Bank accepted the return and debited First National's account. See id. at 1224-25.

First National filed suit against Colonial and the Reserve Bank, continuing to argue that Colonial was strictly liable for the face amount of the checks that First National had presented because Colonial had wrongfully returned them after the midnight deadline imposed by Article 4 of the UCC, and that the Reserve Bank had wrongfully accepted the late return. See id. at 1225. Colonial argued that First National was not entitled to recover any of the losses it suffered from the collapsed check kiting scheme because First National had acted in bad faith by failing to notify Colonial of the scheme and by "deliberately caus[ing] confusion in returning the First National Checks, . . . caus[ing] Colonial to miss the midnight deadline." Id. at 1229.

The district court agreed with First National that Colonial appeared to be strictly liable for the checks it had failed to return by the midnight deadline. See id. at 1228. The court explained, however, that it had to determine whether First National's lawful return of the checks presented by Colonial, First National's lawful presentation of checks to Colonial for payment, and Colonial's late return of these checks, all of which seemingly dictated strict liability for Colonial under section 4-302 of the UCC, could be defeated on a theory of bad faith on the part of First National. See id. at 1230 n. 11. The court dismissed First National's argument that "introducing the concept of bad faith will muddy the concepts of certainty and finality, which are central to the treatment of kites by Article 4," noting that "the UCC itself . . . injects notions of good faith into every transaction covered by it, and we cannot simply ignore the statute." Id. at 1229. Thus, acknowledging First National's compliance with Article 4 and Federal Reserve rules regarding presentation and return, the court proceeded to determine what level of conduct was required by banks in this type of a situation in order to avoid breaching the required duty of good faith. See id.

The court analyzed this question by addressing two more specific questions: first, is there a good faith duty for a depository bank to disclose its suspicions of a check kiting scheme to a payor bank? And second, is it bad faith for a depository bank that discovers or suspects a check kiting scheme to attempt to shift the unavoidable loss associated with the collapse of a check kiting scheme to some other financial institution? See id. at 1229. The court in First National Bank reviewed the decisions of other courts that had considered similar check kiting situations. See id. at 1229-31 (examining

Citizens Nat'l Bank v. First Nat'l Bank, 347 So. 2d 964 (Miss. 1977), and Cumis Ins. Soc'y, Inc. v. Windsor Bank & Trust Co., 736 F. Supp. 1226 (D. Conn. 1990), and citing Alta Vista State Bank v. Kobliska, 897 F.2d 930 (8th Cir. 1990), Mid-Cal Nat'l Bank v. Federal Reserve Bank, 590 F.2d 761 (9th Cir. 1979) and Schwegmann Bank & Trust Co. v. Bank of La., 595 So. 2d 1185 (La. Ct. App. 1992)). The majority of these courts concluded that with the exception of four specific instances,/7 "a bank has no good faith obligation to disclose a suspected kite or to refrain from attempting to shift the kite loss." Id. at 1230. Agreeing with the approach of these courts, and determining that none of the four possible exceptions applied to the facts in that case, the First National Bank court concluded that First National did not violate its duty of good faith under the UCC. Id. at 1231. Instead, that court concluded that First National's conduct, at most, amounted to a permissible attempt to shift the loss that someone would incur as a result of the collapse of the check kiting scheme. Id.

We agree with and endorse the First National Bank court's determination as to what level of good faith is required by the Illinois Uniform Commercial Code of banks when dealing with a check kiting situation. We also approve of the district court's reliance on the First National Bank court's analysis for guidance in this case. In a situation like the one before us, we find there to be "no duty between competing institutions to inform one another of the existence of a check kiting scheme because these institutions deal at arms length, [and] have their own means of detecting check kiting [schemes]." Cumis Ins. Soc'y, Inc., 736 F. Supp. at 1233. While we might have reached a different conclusion if one of the four exceptions previously mentioned were found in this case, i.e., if there had been a fiduciary or confidential relationship between Frost and FOA, if there were a contractual relationship between the two banks, if a more stringent duty had been created by law, or if FOA had committed fraud in dealing with Frost, we find no such exceptions here. Therefore, FOA's duty of good faith did not require it to disclose to Frost that it suspected that Geekie was running a check kiting scheme. Likewise, FOA did not have to refrain from attempting to shift the inevitable loss away from itself and onto the other financial institutions victimized by Geekie and Parker.

In its second criticism of the district court's decision, Frost argues that even if the district court correctly relied on the legal analysis set out in First National Bank, there are glaring

factual distinctions between the two cases that render the district court's reliance on that court's decision erroneous. Frost contends that FOA took steps beyond the actions of the depository bank in First National Bank, and that these steps constitute bad faith. Once again Frost attacks the manner in which FOA collapsed the kite. As evidence of FOA's bad faith, Frost points to FOA's use of a holding account, and FOA's refusal to tell Frost of the kite, both in the manner in which it returned checks, and by declining to inform Frost of the kite even when Frost directly contacted FOA seeking information. Frost also argues that FOA breached its duty of good faith by representing to the banking community that the Midwest Autohaus account was a traditional deposit checking account, when in fact it was the functional equivalent of a line of credit from FOA.

Having already found that FOA's duty of good faith under the UCC did not require it to either disclose to Frost that it suspected a check kiting scheme or refrain from attempting to shift the loss from the kite on to Frost, we are able to dispose of this final claim in short order. Despite Frost's insistence to the contrary, the manner in which FOA returned checks, its failure to disclose its suspicions to Frost, its use of a holding account, and its representations to the banking community as to the nature of Geekie's account do not constitute bad faith. Our de novo review of the actions taken by FOA to collapse the suspected kite support only one conclusion, that "[a]t worst, the facts in this case demonstrate that FOA successfully shifted to Frost the loss from Geekie and Parker's kite." Frost Nat'l Bank, No. 95-2150, at 22 (C.D. Ill. Feb. 26, 1999).

III. Conclusion

Because we find that the district court properly construed the evidence in ruling on FOA's motion for summary judgement, and we agree with its determination that FOA neither violated the RICO conspiracy statute nor breached its duty of good faith under the Illinois Uniform Commercial Code in dealing with Geekie and Parker's check kiting scheme, we AFFIRM the decision of the district court granting FOA's motion for summary judgment.


/1 At the time of the events surrounding this case FOA was a national banking association duly chartered under the laws of the United States with its principal place of business in Oak Brook, Illinois. FOA is now known as National City Bank of Michigan/Illinois.

/2 Frost is a national banking association duly chartered under the laws of the United States, whose principal place of business is in Bexar County, Texas.

/3 George Ventura, the owner of Mid-America, was convicted for participating in the check kiting scheme, however, his conviction on these counts was overturned on appeal.

/4 Peter Parker is not a part of this appeal because a default judgment was entered against him for failing to appear and answer Frost's complaint.

/5 Section 1962(c) states:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. sec. 1962(c).

/6 With regard to a bank's ability to return a check, section 4-302 explains that:

(a)  If an item is presented to and received by a payor bank, the bank is accountable for the amount of:

(1)  a demand item, other than a documentary draft, whether properly payable or not, if the bank . . . does not pay or return the item or send notice of dishonor until after its midnight deadline.

810 Ill. Comp. Stat. Ann. 5/4-302 (West Supp. 2000). "Midnight deadline" under Article 4 of the UCC "with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." 810 Ill. Comp. Stat. Ann. 5/4-104(a)(10) (West Supp. 2000).

/7 These four exceptions to this general rule were identified as: "(1) where a fiduciary or confidential relationship exists; (2) where a contractual relationship exists; (3) where there is a duty created by law; and (4) where there was fraud or misrepresentation by the defendant bank." First National Bank, 898 F. Supp. at 1231 (citing Cumis Ins. Soc., Inc., 736 F. Supp. at 1233).