OPINION OF THE COURT
Herman Cahn, J.
This is an action by a group of institutional investors who allege that in order to insure repayment of a $15,000,000 loan, a bank participated in a fraud perpetrated by a corporate borrower. The bank, defendant State Street Bank and Trust Company (State Street or the bank), moves for summary judgment (CPLR 3212) dismissing the complaint.
Facts
The action arises out of the massive fraud by the principals of Sharp International Corp., who diverted over $44,000,000 from the company between 1997 and 1999. Sharp was in the business of importing and selling inexpensive wristwatches and pens to retailers. During the relevant period, Sharp was owned and controlled by three brothers, Bernard, Herbert and Lawrence Spitz.
In December 1996, Sharp entered into a credit agreement with defendant State Street. Sharp’s outstanding credit balance with State Street eventually reached $26,000,000. In the spring of 1998, Sharp’s investment banker, UBS Warburg Dillon Reed, approached the plaintiff financial institutions to solicit their purchase of Sharp’s subordinated notes. As a condition to participating in the financing, plaintiffs required Sharp to provide financial statements for the fiscal years ending in March 1997 and March 1998, audited by a national accounting firm. KPMG was ultimately selected.
In July 1998, plaintiffs purchased $17,500,000 worth of notes from Sharp pursuant to a written agreement (the first note agreement). Sharp applied a portion of those proceeds toward the State Street debt, which was reduced to $15,000,000 by the fall of 1998.
In the summer of 1998, State Street learned that another of its borrowers had perpetrated a fraud by, inter alia, creating fictitious accounts receivable, resulting in a loss to the bank of approximately $20,000,000. This created a “heightened sensitivity” to possible fraud at Sharp in the ensuing months because Sharp, like the other borrower, had dealings with an entity called Kent International Associates at which massive fraud had also been reported. Additionally, Sharp’s financial reporting was *266 apparently not always timely or sufficiently detailed, and very few of Sharp’s cash proceeds flowed through a lockbox account that State Street had set up to monitor Sharp’s accounts receivable.
Accordingly, State Street placed Sharp under increased scrutiny in the fall of 1998. State Street credit and risk policy senior vice-president Nancy Loucks carefully reviewed the Sharp account, bringing in specialists to assist in the redocumentation and collection of the loan. The bank also attempted to independently confirm Sharp’s business relationships, calling the watch departments of various Kmart and Wal-Mart stores to determine whether they actually sold Sharp watches.
Furthermore, in October 1998, State Street retained the services of First Security Investigative Services to conduct a public record research of Sharp and its principals. On November 3, 1998, First Security delivered a 66-page written report which reported that one or more of the Spitz brothers were the owners of a California property in Palm Springs. State Street’s head field examiner recognized the Palm Springs property as being the address of Akia, one of Sharp’s largest customers. A second report later that month revealed that the property was the private residence of Herbert Spitz. On or about November 9, 1998, the field examiner advised KPMG that in view of Sharp’s failure to provide adequate financial reporting, including accounts receivable aging, State Street could not disprove that Sharp was inaccurately representing its collateral.
On November 16, 1998, Loucks ordered Dun & Bradstreet (D&B) reports on 18 companies whose names resembled Sharp customers. The reports showed that some of the customers were in businesses other than selling watches at retail, and that at least one had gone out of business in 1991. Loucks testified that at the time she had concerns about fraud at Sharp, as well as reservations about the reliability of the D&B reports. In view of its growing concerns over Sharp’s documentation, State Street scheduled a meeting with Sharp on November 30, 1998.
At that meeting, Sharp complained that the bank’s attempts to confirm Sharp’s receivables were interfering with its business and complained about the field examiner’s communications with KPMG. However, State Street did not confront Sharp with the results of its investigation into Sharp’s customers and accounts receivable. Instead, the bank proposed that Sharp seek financing from other sources to pay off its indebtedness. Sharp indicated that it would rather repay State Street than re- *267 document the loan on the bank’s terms. Ultimately, Sharp agreed to repay its debt to State Street by March 1, 1999.
In February 1999, Sharp’s investment bankers again contacted plaintiffs to raise an additional $25,000,000. Plaintiffs were advised that the proceeds would be used, at least in part, to pay down the State Street debt. In preparation for this closing (the second note closing), plaintiffs reviewed the prior audited financial statements issued by KPMG for 1997-1998 and spoke with representatives of Sharp, KPMG and Dillon Reed. However, plaintiffs did not wait for the audited financial statements for the fiscal year ending in March 1999. Plaintiffs did not speak to anyone at State Street about the proposed note purchase. Although plaintiffs at one point attempted to contact the bank for a reference, State Street declined to accept or return their calls.
Prior to the closing, State Street gave Sharp a letter consenting to Sharp’s proposed additional debt with the plaintiffs (the consent letter). On March 23, 1999, plaintiffs purchased the additional $25,000,000 of notes. State Street was not advised that the note sale had closed. In fact, Sharp falsely advised the bank in late March 1999 that the transaction would not close, and that Sharp would be unable to raise more than $10,000,000 from other sources. In April 1999, State Street accepted a payment of $12,300,000 plus a promissory note for $2,700,000 from Sharp’s principals in full satisfaction of Sharp’s debt. That note was defaulted.
On July 1, 1999, Sharp failed to deliver the KPMG audited financials for the fiscal year ending March 1999, as required by the parties’ agreement, to plaintiffs. Sharp also failed to make a scheduled interest payment to plaintiffs on July 8, 1999. In August 1999, plaintiffs learned that KPMG had resigned from its engagement with Sharp and had withdrawn its prior audit statements.
On August 10, 2000, plaintiffs and their counsel met with the Spitz brothers and their counsel. The Spitz brothers refused to answer any questions and plaintiffs were advised that they would “take the Fifth.” Plaintiffs attempted to negotiate a forbearance agreement which would have allowed the Spitz brothers to continue to run the Sharp business. However, the negotiations failed and plaintiffs petitioned for Sharp’s bankruptcy on September 7, 1999.
Since October 1999, Sharp has operated in chapter 11 as a debtor-in-possession under the supervision of FTI Khan *268 Consulting, Inc. On February 29, 2000, after investigating Sharp’s finances, FTI notified the United States Trustee’s Office that Sharp had committed a fraud consisting of “overstatement of sales, the overstatement of purchases, [and] the extensive level of cash disbursements.” In November 2000, the Bankruptcy Court entered a judgment of $44,378,650.30 against the Spitz brothers. On October 4, 2002, the Spitz brothers pleaded guilty to criminal charges of defrauding State Street, and others (United States v Spitz, US Dist Ct, ED NY, Trager, J., 02-CR-1127).
In 2001, Sharp, as debtor-in-possession, commenced an adversary proceeding against State Street in the Bankruptcy Court (see, In re Sharp Intl. Corp., 281 BR 506 [Bankr ED NY 2002]). Upon facts virtually identical to those alleged in the instant complaint, the debtor alleged that State Street aided and abetted the Spitz brothers’ breach of their fiduciary duty to Sharp and its creditors (including plaintiffs), and that Sharp’s partial repayment of State Street’s loan from the proceeds of the second note closing was a fraudulent conveyance because the bank knew of, but did not disclose, Sharp’s fraud. The court dismissed the complaint in its entirety.
With respect to the aiding and abetting claim, the court held that State Street could not be held liable because it had merely constructive, not actual, knowledge of the Spitz brothers’ looting of their company, and because State Street’s mere inaction in the face of fraud could not constitute substantial assistance in the absence of a fiduciary relationship between the parties {id. at 513-517). In connection with the fraudulent conveyance claim, the court stated that “[although State Street may have had actual or constructive knowledge that Sharp defrauded the Noteholders, this Court does not believe that Sharp has alleged any act by State Street that constitutes participation in the fraud” {id. at 523).
Discussion
The instant complaint sets forth claims for fraud, negligent concealment and aiding and abetting fraud.
In opposition to the motion, plaintiffs consent to the dismissal of the negligent concealment claim but seek to assert a new claim for civil conspiracy.
After substantial discovery, plaintiffs have failed to adduce any additional evidence of fraud or misconduct beyond the allegations pleaded in, and rejected as insufficient by, the Bank *269 ruptcy Court. Accordingly, despite the slightly differing theories for relief proffered in this action, the complaint is dismissed.
Fraud (First Cause of Action)
Plaintiffs’ first cause of action, for fraud, rests on a theory of fraudulent concealment. Plaintiffs allege that “[d] espite its knowledge of Sharp’s fraud, State Street deliberately, intentionally and knowingly concealed this fraud from plaintiffs so that plaintiffs would purchase the subordinated notes from Sharp for $25 million, which money would then be used by Sharp to pay down its debt to State Street.” Plaintiffs further allege that “State Street had a duty to disclose its knowledge concerning the Sharp fraud to plaintiffs because State Street had knowledge of the Sharp fraud, and particular and superior knowledge compared to the plaintiffs” by virtue of the information it received as a secured lender and by virtue of its investigation into Sharp’s accounts in late 1998.
In addition to the traditional elements of misrepresentation, scienter, reliance, and damages, a plaintiff alleging fraud based upon fraudulent concealment must allege a duty to disclose material information (P.T. Bank Cent. Asia v ABN AMRO Bank N.V., 301 AD2d 373 [1st Dept 2003]). The duty must be based upon some special relationship between the parties (see, National Union Fire Ins. Co. of Pittsburgh, Pa. v Red Apple Group, 273 AD2d 140 [1st Dept 2000]). “In the absence of a contractual relationship or a confidential or fiduciary relationship, a party may not recover for fraudulent concealment of fact, since absent such a relationship, there is no duty to disclose” (900 Unlimited, Inc. v MCI Telecom. Corp., 215 AD2d 227, 227 [1st Dept 1995]; see, Auchincloss v Allen, 211 AD2d 417 [1st Dept 1995]).
Although a duty to disclose has sometimes been found to arise where one party has superior knowledge, the context has invariably involved direct negotiations between parties to a business transaction (see, Renner v Chase Manhattan Bank, 2000 WL 781081, 2000 US Dist LEXIS 8552 [SD NY, June 16, 2000]; Ray Larsen Assoc., Inc. v Nikko Am., Inc., 1996 WL 442799, *5, 1996 US Dist LEXIS 11163, *14 [SD NY, Aug. 6, 1996] [“A review of the cases which recognize a duty to disclose due to one party’s superior knowledge reveals that the duty ordinarily arises only in the context of business negotiations where parties are entering a contract”]; see, e.g., Allen v WestPoint-Pepperell, Inc., 945 F2d 40 [2d Cir 1991]; Strasser v Prudential Sec., 218 AD2d 526 [1st Dept 1995]; Stevenson Equip. v Chemig Constr. Corp., 170 AD2d 769 [3d Dept 1991]). Moreover, a bank ordinarily does not *270 have an obligation to disclose information regarding a borrower to the borrower’s investors (see, Athey Prods. Corp. v Harris Bank Roselle, 89 F3d 430 [7th Cir 1996]; Glidden Co. v Jandernoa, 5 F Supp 2d 541 [WD Mich 1998]), even where the bank might benefit from its silence (see, Smith v American Natl. Bank & Trust Co., 982 F2d 936 [6th Cir 1992]; Frost Natl. Bank v Midwest Autohaus, Inc., 241 F3d 862 [7th Cir 2001]).
Here, State Street had no duty of disclosure to plaintiffs because it had no fiduciary or other relationship with them, and did not even communicate with them in connection with the second note closing. Moreover, the bank’s knowledge was not, as a matter of law, superior to plaintiffs because plaintiffs had access to the same sources of information (see, Grumman Allied Indus., Inc. v Rohr Indus., Inc., 748 F2d 729 [2d Cir 1984]; Congress Fin. Corp. v Morrell & Co., 790 F Supp 459 [SD NY 1992]). Under the agreements with Sharp, plaintiffs had unrestricted access to the company’s books and records. Plaintiffs could have ordered the same D&B reports that they now claim confirmed the fraud, or hired investigators to do public records searches concerning Sharp’s properties, as defendant apparently did. Likewise, plaintiffs could have waited for KPMG to issue its audit for the fiscal year ending in March 1999, before closing, instead of relying on the prior year’s audit.
Although plaintiffs additionally argue that a duty to supply-information to correct or clarify a half-truth may arise where a party has made a partial or ambiguous statement (see, Brass v American Film Tech., Inc., 987 F2d 142 [2d Cir 1993]), they do not identify any such statement made by State Street in connection with the relevant transaction. Instead, they rely upon a positive reference given by a bank officer during a short telephone call just prior to the execution of the first note agreement in the summer of 1998. That reference was not misleading or partial at the time it was made, as the information which gave rise to the bank’s suspicions was not discovered until later in the year. In the absence of a fiduciary relationship, the bank did not have an obligation to continuously update its appraisal of Sharp (see, e.g., Banco Espanol de Credito v Security Pac. Natl. Bank, 973 F2d 51 [2d Cir 1992]; Banco Urquijo, S.A. v Signet Bank/Md., 861 F Supp 1220 [MD Pa 1994]).
Plaintiffs also urge that the consent letter and financing documents referenced therein constituted partial and misleading statements that State Street enjoyed a good relationship with Sharp and would continue as its lender. However, the letter *271 made no such representations to plaintiffs, and cannot reasonably be viewed as representation from the bank at all. Moreover, plaintiffs have submitted no evidence that any of their representatives actually read or relied on the letter.
Aiding and Abetting/Conspiracy
The complaint alleges that State Street aided and abetted Sharp’s fraud by providing its written consent to the transaction and withholding information that the bank knew would cause plaintiffs to forgo the purchase of notes. On this motion, plaintiffs additionally allege that the bank conspired with Sharp at the November 30, 1998 meeting by encouraging Sharp to find investors to pay off the loan, investors whom the bank knew Sharp would solicit with falsified financial information. Plaintiffs also allege that the bank assisted Sharp by monitoring the transaction, reviewing the closing documents and consciously avoiding contact with plaintiffs.
To plead a prima facie case for aiding and abetting, a plaintiff must allege that the defendant “substantially assisted” in a fraud (see, King v George Schonberg & Co., 233 AD2d 242 [1st Dept 1996]; DePinto v Ashley Scott, Inc., 222 AD2d 288 [1st Dept 1995]). Allegations of mere inaction or silence are insufficient to sustain a claim for aiding and abetting unless the defendant has an independent duty to the plaintiff (King, supra; Superintendent of Ins. of State of N.Y. v Spira, 289 AD2d 173 [1st Dept 2001]; National Westminster Bank USA v Weksel, 124 AD2d 144 [1st Dept 1987]). A bank’s mere acceptance of a loan repayment despite knowledge of the debtor’s wrongful conduct does not rise to the level of aiding and abetting (see, Atlanta Shipping Corp. v Chemical Bank, 818 F2d 240 [2d Cir 1987]; Renner, supra).
This court concurs with the bankruptcy judge that the allegations regarding State Street do not state a valid cause of action for liability for aiding and abetting. In rejecting the claim asserted by the debtor-in-possession in the adversary proceeding against the bank, the Bankruptcy Court observed:
“Sharp alleges that State Street affirmatively induced the Spitzes to expand the fraud by obtaining ‘new financing from investors unaware of the fraud’ and substantially assisted the fraud when one of its officers deliberately dodged phone calls from the proposed new investors, and when State Street gave its consent to Sharp’s sale of $25 million in subordinated notes to those investors. It is *272 difficult to see how failure to return or refusing to take phone calls, even if characterized as ‘dodging’ calls, could constitute more than inaction. Furthermore, Sharp’s pleading that State Street induced the fraud on the Noteholders by demanding that Sharp obtain ‘new financing from investors unaware of the fraud’ falls short ... by failing to allege who made the demand, who else was present, exactly what was said, and where this occurred.” (In re Sharp, supra at 516-517 [citations omitted].)
Additionally, in connection with the debtor’s fraudulent conveyance claim, the court later noted:
“The closest Sharp comes to pleading participation by State Street in a fraud against the Noteholders is the allegation that State Street consented to the transaction, and that under the State Street loan documents such consent was necessary in order for Sharp to close the transaction with the Noteholders. However, providing consent to another transaction by the borrower under a loan agreement, even with actual or constructive knowledge that the borrower is engaging in fraud, does not constitute participation in the fraud so as to transform the subsequent repayment of the loan into an intentional fraudulent conveyance. Where a loan agreement prohibits a borrower from incurring other indebtedness without the lender’s consent, this provision is for the benefit of the lender, and the lender’s decision whether or not to consent is governed by the lender’s assessment of its own best interests. If the loan agreement so provides, the lender may not unreasonably withhold its consent to a borrower’s request for permission to incur other indebtedness; however, under New York law, in the absence of such a provision, the lender may give or withhold its consent in its sole discretion. Certainly there is no authority requiring a lender to consider the interests of third parties (such as, in this case, the Noteholders) in exercising its right to give or withhold consent under a loan agreement. Such a rule would effectively make the Noteholders third-party beneficiaries of the Loan Agreement between Sharp and State Street. There is no basis under New York law for such a result.” (In re Sharp, supra at 523-524 [citations omitted].)
*273 Discovery in this action has not revealed any conduct by the bank more serious than that alleged in the adversary proceeding. Moreover, liability for aiding and abetting requires a showing that the defendant had actual knowledge of the fraud alleged (see, In re Sharp, supra at 514; Laro, Inc. v Chase Manhattan Bank, 269 AD2d 188 [1st Dept 2000]). As the Bankruptcy Court concluded, State Street’s knowledge of Sharp’s misconduct was constructive. The record shows that the D&B reports confirmed the existence of some of Sharp’s customers and were inconclusive as to others. Furthermore, while the reports showed that some of the reported customers were in businesses other than selling watches at retail, they did not exclude the possibility that the companies did in fact also sell watches. State Street’s calls to the chain retailers confirmed that they sold Sharp’s merchandise. And although the First Security report indicated that the company “Akia” shared an address with one of the Spitz brothers, the bank could not rule out the possibility that it was a legitimate one-man operation. Thus, while the other inaccuracies in Sharp’s account information certainly gave the bank reason to be highly suspicious of its veracity, such suspicions cannot be equated with actual knowledge — particularly not actual knowledge that the Spitz brothers were diverting tens of millions of dollars of corporate funds.
Finally, plaintiffs’ newly-raised civil conspiracy claim must fail. A claim for civil conspiracy requires, inter aha, “proof of an agreement to engage in a common scheme or plan to deprive plaintiff of his property” (Truong v AT&T, 243 AD2d 278, 278 [1st Dept 1997] [emphasis supplied]). Plaintiffs do not allege any such agreement. To the contrary, they concede that the bank did not discuss any fraud with Sharp at the November 30, 1998 meeting, and in fact declined to confront the company with its suspicions. Moreover, the bank communicated its suspicions to KPMG, which was auditing Sharp. Accordingly, the bank cannot be charged with conspiring with Sharp’s principals, who, as noted, later pleaded guilty to defrauding State Street as well.
Accordingly, it is ordered that the motion to dismiss the complaint is granted, and the complaint is dismissed, with costs and disbursements to defendant as taxed by the Clerk of the Court.